# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CHESTER COUNTY EMPLOYEES' RETIREMENT FUND on behalf of itself and all other similarly situated former stockholders of KCG HOLDINGS, INC.,

Plaintiff,

v.

KCG HOLDINGS, INC., DEBRA J. CHRAPATY, DANIEL COLEMAN, PETER R. FISHER, CHARLES E. HALDEMAN, JR., RENE M. KERN, JAMES T. MILDE, JOHN C. (HANS) MORRIS, ALASTAIR RAMPELL, DANIEL F. SCHMITT, LAURIE M. SHAHON, COLIN SMITH, HEATHER E. TOOKES, ADRIAN WELLER, VIRTU FINANCIAL, INC., and JEFFERIES LLC,

Defendants.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

C.A. No. 2017-0421-KSJM

## MEMORANDUM OPINION

Date Submitted: March 20, 2019
Date Decided: June 21, 2019

Michael Hanrahan, Paul A. Fioravanti, Jr., Kevin H. Davenport, Samuel L. Closic, Eric J. Juray, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Eric L. Zagar, J. Daniel Albert, Stacey A. Greenspan, Matthew C. Benedict, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Jeremy S. Friedman, Spencer Oster, David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, New York, New York; *Counsel for Chester County Employees' Retirement Fund.*

Daniel A. Mason, Brendan W. Sullivan, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Andrew G. Gordon, Susanna M. Buergel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Counsel for Virtu Financial, Inc. and KCG Holdings Inc. (n/k/a Virtu KCG Holdings LLC)*.

William M. Lafferty, Ryan D. Stottmann, Coleen W. Hill, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants Debra J. Chrapaty, Daniel Coleman, Peter R. Fisher, Charles E. Haldeman, Jr., Rene M. Kern, James T. Milde, John C. (Hans) Morris, Alastair Rampell, Daniel F. Schmitt, Laurie M. Shahon, Colin Smith, Heather E. Tookes and Adrian Weller*.

Gregory V. Varallo, Kevin M. Gallagher, Sarah T. Andrade, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Brian A. Herman, John M. Maloy, MORGAN, LEWIS & BOCKIUS LLP, New York, New York; *Counsel for Jefferies LLC*.

**McCORMICK, V.C.**

In July 2017, Virtu Financial, Inc. ("Virtu") acquired KCG Holdings, Inc. ("KCG") for $20 per share. In this case, a former KCG stockholder alleges KCG's directors failed to maximize value for the KCG stockholders in negotiating the merger, largely because of the actions of different influencers at both the beginning and the very end of the process that led to the transaction.

At the front end of the process, the plaintiff points to secret dealings between Virtu and Jefferies LLC ("Jefferies"), KCG's largest stockholder and long-time financial advisor, which allegedly undermined the KCG board's ability to extract greater value from Virtu. The plaintiff contends that beginning in December 2016 and continuing through February 2017, Virtu and Jefferies met and discussed a potential acquisition of KCG. During that time, Jefferies proposed to Virtu that a sale of KCG's standalone bond-trading platform, BondPoint, would increase KCG's tangible book value ("TBV") to over $21 per share. Jefferies even gave Virtu confidential information about BondPoint, information which the plaintiff alleges Jefferies obtained as KCG's financial advisor. The plaintiff posits that by mid-February, Virtu and Jefferies had agreed that Jefferies would support a $20 per share deal price, and Virtu would sell BondPoint post-acquisition using Jefferies as its financial advisor.

Meanwhile, KCG's board was unaware that Virtu was interested in acquiring KCG until late February. On February 23, 2017, Virtu sent KCG's board a proposal

1

to acquire KCG at a price in the range of $18.50 to $20 per share.  At the time, Jefferies was advising KCG's board on a restructuring plan that KCG's management believed was a financially superior alternative to KCG's offer.  KCG's board still determined to engage in negotiations with Virtu at Jefferies' recommendation.

Just before KCG received Virtu's initial expression of interest, Jefferies informed KCG's board of some—but not all—of its discussions with Virtu.  Not immediately, but eventually, KCG became suspicious of Jefferies, tried to exclude Jefferies from the sales process, and hired another financial advisor.  But Jefferies continued to advise KCG on the restructuring plan and pressure KCG's board to pursue a transaction with Virtu.

At the back end of the process, the plaintiff points to different culprits.  In April 2017, Virtu made its best and final bid of $20 per share.  Every director except for KCG's chief executive officer, Daniel Coleman, approved a $20.21 per share counteroffer.  Coleman told the board that a $20.21 counteroffer was "too low" and that the restructuring plan would create 25% more value than KCG's offer.  Still, Coleman promised that he would support the merger *if* he could negotiate a satisfactory compensation and retention pool for himself and his management team.  Coleman's desire to obtain compensation for his management team conflicted with the KCG board's obligation to maximize consideration paid to the KCG stockholders.  Despite this conflict, the board authorized Coleman to negotiate

2

simultaneously the compensation pool and deal price. In the end, KCG rejected the $20.21 counteroffer and Coleman negotiated a compensation pool to his satisfaction. Then, the KCG board—including Coleman—approved a $20 per share price.

Compounding concerns, the night before the board approved the $20 per share price, Coleman and his management team revised the company's financial projections to be more pessimistic. The plaintiff says that the board approved those revisions over email. KCG's financial advisor then based the fairness opinion on the more pessimistic projections. With the revised projections, the deal price fit squarely in the middle of the financial advisor's discounted cash flow analysis.

The plaintiff commenced this litigation shortly after KCG announced the merger. Initially, the plaintiff sought a preliminary injunction based on a claim that the merger was subject to anti-takeover measures found in Section 203 of the Delaware General Corporation Law. After discovery on the preliminary injunction motion, KCG issued a new proxy designed to moot the plaintiff's Section 203 claim, and the plaintiff withdrew the preliminary injunction motion. Using documents and testimony obtained in the preliminary injunction phase, the plaintiff amended its complaint to allege that the director defendants breached their fiduciary duties in negotiating and approving the merger and that Virtu and Jefferies aided and abetted in those breaches. The plaintiff also asserted a civil conspiracy claim against Virtu and Jefferies.

3

The defendants have moved to dismiss the complaint. They argue that the merger is subject to the deferential business judgment standard of review under *Corwin v. KKR Financial Holdings LLC* because it was approved by a majority of KCG's stockholders in a fully informed, uncoerced vote.[1]

The plaintiff, however, has identified three significant deficiencies in the defendants' disclosures concerning the merger that render the stockholder vote uninformed.

First, the proxy fails to disclose detailed information about the BondPoint divestiture strategy proposed by Jefferies to Virtu. The proxy instead includes an ambiguous statement that Jefferies proposed that "certain divestitures" could raise KCG's TBV, creating the misleading impression that the divestiture strategy was undeveloped. By contrast, the complaint portrays a detailed, BondPoint-specific divestiture strategy informed by confidential financial information not previously disclosed to the stockholders. Next, the proxy fails to disclose Coleman's initial "too low" view of the $20.21 per share counteroffer, later support of the $20 per share deal price, and intervening negotiations of the compensation pool. Last, the proxy fails to disclose the more optimistic, earlier projections presented during the merger negotiations and the circumstances surrounding the creation of the later

---

[1] 125 A.3d 304 (Del. 2015).

revised projections. It is reasonably conceivable that a stockholder would view the omitted facts as material and that the information disclosed is materially misleading.

Because the plaintiff alleges facts sufficient to support a finding that the stockholder vote was not fully informed, *Corwin* does not lead to dismissal.

As an independent basis for dismissal, the defendants argue that the plaintiff fails to state non-exculpated claims against the director defendants. The complaint, however, adequately alleges that the director defendants were fully complicit in the procedural flaws at the back-end negotiations. According to the complaint, the director defendants knowingly placed Coleman in a position to extract compensation for management at the expense of the per share merger price received by the stockholders. They then approved last-minute revisions to the company's projections that made the deal price more reasonable relative to the company's discounted cash flow valuation. These actions are enough to infer bad faith and state a non-exculpated claim for breach of fiduciary duties.

The claims of aiding and abetting and conspiracy against Virtu and Jefferies also survive the defendants' motion. Claims for breach of the duty of care, though exculpated, provide a valid predicate for claims of aiding and abetting. Here, at a minimum, the plaintiff's concerns about the front-end process flaws concerning Jefferies and Virtu's secret negotiations adequately state a claim that the director defendants breached their duty of care. The complaint also adequately alleges that

5

Virtu and Jefferies created the sort of informational vacuum this Court has found sufficient to constitute knowing participation in a breach of fiduciary duties in support of an aiding and abetting claim. Further, the complaint adequately alleges facts from which it can be inferred that Virtu and Jefferies conspired to pursue the merger for their own benefit and to the detriment of the stockholder class.

## I. FACTUAL BACKGROUND

The background facts come from the Verified Second Amended Class Action Complaint (the "Complaint") and documents it incorporates.[2]

### A. Jefferies' History with KCG

KCG was a global financial services firm that offered market-making, high-frequency trading services across asset classes, product types, and time zones. KCG was the product of a 2013 merger between GETCO Holding Company, LLC and Knight Capital Group, Inc. ("Knight Capital"). Jefferies had owned an interest in Knight Capital. As a result of the 2013 merger, Jefferies received a large pay-out and financial advisory fees while simultaneously retaining a substantial equity position in Knight Capital, later named KCG. Over the next three years, Jefferies nearly doubled its stake in KCG and continued to receive substantial financial advisory fees. In the fall of 2016, Jefferies advised KCG to repurchase the largest

---

[2] C.A. No. 2017-0421-KSJM, Docket ("Dkt.") 155, Verified Second Am. Class Action Compl. (cited as "Sec. Am. Compl.").

stockholder's shares. After the buyback, Jefferies became KCG's largest stockholder, owning approximately 24% of KCG's outstanding stock. The Complaint alleges that in 2016, Jefferies was looking to cash out of its KCG investment.

**B.    Virtu Reaches Out to Jefferies to Express an Interest in Acquiring KCG**

Virtu was one of KCG's primary competitors. It had unsuccessfully pursued an acquisition of Knight Capital in 2012. By late 2016, Virtu viewed KCG's stock price as depressed and considered acquiring KCG. On December 19, 2016, Virtu's controlling stockholder, Vincent Viola, told Jefferies' CEO Richard Handler about Virtu's interest in acquiring KCG.

Right after his meeting with Viola, Handler began negotiating a deal to sell KCG to Virtu. Handler asked Alexander Yavorsky, a Jefferies investment banker and long-time advisor to KCG, to analyze a $20 per share acquisition of KCG. The $20 per share price was based on the projected increase in KCG's TBV—the value of a company's equity after removing intangible assets—resulting from a sale of KCG's standalone bond trading platform, BondPoint. The next morning, Yavorsky provided Handler an analysis illustrating that BondPoint's sale would likely yield at least $200 million in proceeds and raise KCG's TBV by more than $2.20 per share to between $21 and $21.50 per share.

On December 20, 2016, Handler met with Virtu's CEO, Douglas Cifu, who proposed that Virtu acquire KCG for $17 to $18 per share. Relying on Yavorsky's analysis, Handler countered that TBV was the proper way to value KCG, and that KCG's TBV would increase to at least $21 per share upon BondPoint's sale. Two days later, Cifu sent a text message to Handler saying that Jefferies' position on KCG's sale was "loud and clear," and Cifu was "[g]oing to run through some models with [Viola]" and get back to Handler in January 2017.[3]

On December 27, 2016, Handler emailed KCG's CEO, Daniel Coleman, to suggest that KCG sell BondPoint and use the proceeds to repurchase KCG shares. Coleman responded that at that time KCG was not interested in a sale of BondPoint, which was experiencing rapid growth. Handler did not disclose to Coleman his discussions with Virtu. At the time, KCG management was developing a restructuring initiative (the "Restructuring Plan"). Indeed, Jefferies was assisting KCG with this effort. Coleman stated that a sale of BondPoint might be worth considering after the restructuring.

Virtu prepared for negotiations concerning KCG throughout January 2017. In preparing, Virtu assumed a post-acquisition sale of BondPoint. On January 24, 2017, Virtu's CFO, Joseph Molluso, had Virtu's financial advisor, J.P. Morgan

---

[3] *Id.* ¶ 74 (second alteration added).

Securities LLC ("J.P. Morgan"), prepare a sensitivity table calculating KCG's TBV after a sale of BondPoint and repurchase of shares.

Jefferies' Yavorsky delivered an hour-long presentation on KCG to Virtu on February 14, 2017. Notes from the meeting indicate that Yavorsky shared with Virtu confidential information regarding BondPoint, which Jefferies acquired as KCG's financial advisor. That information included BondPoint's EBITDA, growth rate, and projected value. KCG had never publicly disclosed that information nor authorized Jefferies to disclose it to Virtu.[4]

The next day, Jefferies' Yavorsky floated a potential price range to Virtu's Molluso. Yavorsky stated that Jefferies was "[f]ocused on a price with a 2 handle," and Molluso "socialized that there [was] a bid offer [of] $18–$20 . . . ."[5] In an internal Virtu update, Molluso told Viola that Jefferies "[c]learly wants to do something."[6] Viola responded, "[w]e can make a deal happen."[7]

---

[4] In its briefs, Jefferies contends that it is not reasonably conceivable that it supplied confidential information to Virtu on an "unrestricted basis." Dkt. 166, Def. Jefferies LLC's Opening Br. in Supp. of its Mot. to Dismiss ("Jefferies' Opening Br.") at 35–36; Dkt. 184, Def. Jefferies LLC's Reply Br. in Further Supp. of its Mot. to Dismiss ("Jefferies' Reply Br.") at 17–18. For this proposition, Jefferies relies on Cifu's deposition transcript, who proffered a factual defense to this allegation. At the pleadings stage, the court must draw all reasonable inferences in Plaintiff's favor. Applying that rule, it is reasonably conceivable from Plaintiff's allegations that Jefferies disclosed confidential KCG information to Virtu.

[5] Sec. Am. Compl. ¶ 82 (alterations in original).

[6] *Id.* ¶ 82 (alteration in original).

[7] *Id.* ¶ 83 (alteration in original).

9

Jefferies and Virtu's CEOs met on February 16, 2017. They discussed KCG's TBV and the price Jefferies would accept for its KCG shares. A few hours later, Molluso emailed Yavorsky to discuss BondPoint. Over the next few days, Handler and Cifu exchanged text messages on the timing and contents of Virtu's initial bid to KCG.

### C.   Virtu Offers to Acquire KCG

The plaintiff posits that, by the February 16, 2017 meeting of CEOs, Jefferies and Virtu had reached a meeting of the minds that Jefferies would support Virtu's acquisition of all outstanding KCG shares for $20 per share. It was not until February 21, 2017, however, that Jefferies informed KCG of Virtu's interest in acquiring KCG. At that time, Handler told Coleman that Virtu would be making a formal offer to acquire KCG. Handler did not disclose to Coleman or anyone else at KCG that he had been negotiating with Virtu over the past two months.

On February 22, 2017, Jefferies' Yavorsky told KCG's deputy general counsel about his February 14 meeting with Virtu. The deputy general counsel shared the news with KCG's general counsel, who then called Yavorsky directly. During these conversations, Yavorsky only discussed his February 14 meeting and did not provide information concerning his other communications with Virtu.

On February 23, 2017, Virtu's Cifu emailed KCG's Coleman a non-binding indication of interest to acquire KCG at a price in the range of $18.50 to $20 per

share in cash.[8]  This offer represented a significant premium to the then-current trading price of $14.31, but it received a cool reception.

Coleman acknowledged Virtu's bid, but accelerated management's efforts on the Restructuring Plan, which "management believed would return more capital to stockholders with less risk and disruption than a transaction with Virtu . . . ."[9]  At that time, Coleman did not know the full extent of Jefferies' discussions with Virtu and he engaged Jefferies, and specifically Yavorsky, to help formulate the Restructuring Plan.

### D.     KCG's Board Retains Advisors

On February 26, 2017, KCG's twelve-person board of directors (the "Board") established a four-person sub-committee of outside directors to recommend an independent financial advisor to advise KCG in negotiations with Virtu.[10]  The sub-committee met with various firms.

On March 15, 2017, the Board met and decided, at the recommendation of the sub-committee, to retain Goldman Sachs ("Goldman") as KCG's financial advisor, and Sullivan & Cromwell LLP as KCG's legal advisor.

---

[8] After Cifu submitted the bid letter, Viola emailed Cifu predicting that Coleman "will be overwhelmed by [H]andler" in the negotiations to sell KCG. *Id.* ¶ 92.

[9] *Id.* ¶ 94.  *See also id.* ¶ 107 ("[I]t was management's belief that the value from the [Restructuring] Plan would be approximately 25% higher than the current proposal from Virtu[.]") (alterations in original).

[10] The sub-committee included outside directors James T. Milde (Chairman), Rene M. Kern, Heather E. Tookes, and Alastair Rampell.

## E.  KCG and Virtu Negotiate the Merger Agreement

At the March 15 meeting, the Board discussed the Restructuring Plan and Virtu's bid.  Coleman stated "management's belief that the value from the [Restructuring] Plan would be approximately 25% higher than" Virtu's offer, and stated "there was the potential for significant upside above and beyond the [Restructuring] Plan if the markets were to revert to more normal conditions."[11]  The Board's advisors agreed with this analysis.[12]  The Board concluded that Virtu's offer, even at the $20 per share price at the top-end of the range, undervalued KCG.

The day before the March 15 Board meeting, however, Jefferies had reached out to KCG to encourage it to engage in discussions with Virtu.  And at the Board meeting, despite the directors' view that Virtu's offer undervalued KCG, the Board determined to engage with Virtu as Jefferies recommended.  Goldman took away from the meeting that "Jefferies (in [its] capacity as shareholder) told both the KCG chairman and CEO that if they didn't engage with Virtu, they would 'no longer be

---

[11] *Id.* ¶ 107 (emphasis omitted).

[12] Jefferies had "[s]crutinized management's operating projections . . . [and determined that] the quantum and timing of cost cuts appear generally credible and achievable[.]" *Id.* ¶ 108 (alterations in original).  Goldman affirmed Coleman's and Jefferies' contentions that the Restructuring Plan created the "[p]otential for significant value creation" and Coleman's contention that Virtu's "100% cash offer eliminates any ability for [KCG] shareholders to participate in any further upside post-deal[.]" *Id.* ¶ 109 (alterations in original).

aligned,'" and that Jefferies was "[h]ighly likely to support a takeover; [and] gave price guidance to Virtu prior to its bid."[13]

In a letter to Virtu dated March 15, Coleman requested additional detail from Virtu on what he described as key execution risks related to the proposed transaction, including with respect to retaining KCG employees. Coleman conditioned further discussion with Virtu on "threshold issues," including whether Virtu would (i) raise its price range which, "even at the top-end of the range, significantly undervalue[d] KCG," and (ii) share its retention and compensation plans for KCG's employees.[14]

Virtu responded on March 16, proposing a form of non-disclosure agreement.[15] On March 17, Virtu and KCG entered into a non-disclosure agreement

---

[13] *Id.* ¶ 111 (emphasis omitted).

[14] *Id.* ¶ 116 (emphasis omitted).

[15] After KCG received this letter from Virtu, Yavorsky texted McCarthy "I understand we received a letter back." *Id.* ¶ 118. McCarthy questioned how Yavorsky knew of Virtu's correspondence and requested that Yavorsky summarize and forward his written communications with Virtu. After McCarthy told Coleman about Yavorsky's comment, Coleman instructed Molluso that KCG did not want Virtu talking to Jefferies, and J.P. Morgan should communicate with Goldman. Yavorsky never responded directly to McCarthy's request for details about his communications with Virtu. Instead, on March 29, 2017, Jefferies provided KCG's outside counsel with list of Jefferies' communications with Virtu. The timeline: Omits any reference to Handler's and Cifu's February 16 meeting regarding KCG's value; omits that Handler assisted Virtu in drafting its initial February 23 bid letter; and states that Yavorsky told Cifu he would only discuss public information, but (i) Yavorsky emailed Virtu that he was willing to discuss KCG "on an unrestricted basis"; and (ii) Molluso's notes from the February 14 meeting indicate that Yavorsky shared confidential BondPoint information. *Id.* ¶¶ 119–21.

to allow KCG to commence its diligence process. Virtu received access to KCG's data room on March 20.

### F. KCG Attempts to Cabin Jefferies' Involvement in the Process

Jefferies was frustrated that KCG selected Goldman over Jefferies and continued to push to be retained as an advisor on the merger. Handler demanded to meet with Coleman because, "given all the history, [Coleman] owe[d] [him] that . . . . [H]e deserve[d] this and w[ould] be extremely upset if [Coleman] refuse[d]."[16]

Coleman, however, had grown distrustful of Yavorsky. After KCG received Virtu's March 16 communication, it became clear that Virtu and Yavorksy were in contact. Coleman instructed Virtu to cease communications with Yavorsky and to deal directly with Goldman. KCG also requested details about Jefferies' communications with Virtu. Jefferies' did not respond immediately. On March 29, 2017, Jefferies provided a timeline. The timeline omits: reference to the February 16 meeting of CEOs regarding KCG's value; that Handler assisted Virtu in drafting its initial February 23 bid letter; and that Jefferies shared confidential information with Virtu regarding BondPoint.

Coleman informed Handler that he did not trust and did not want to work with Yavorsky specifically. Despite Coleman's reservations, Coleman offered Jefferies

---

[16] *Id.* ¶ 127 (fourth alteration added).

a $1 million advisory fee for the Restructuring Plan. Handler wanted more and insisted on "a real advisory role with a fair fee" as KCG's merger advisor.[17] Coleman agreed and recommended to the Board that Jefferies serve as co-advisor with Goldman on the merger. Ultimately, a committee of the Board rejected Coleman's recommendation.

### G. Other Expressions of Interest

After the March 15 Board meeting, various news outlets published articles disclosing that Virtu had made an unsolicited offer to purchase KCG. This news led to a dramatic increase in KCG's stock price. KCG issued a press release confirming that it had received an unsolicited proposal from Virtu to acquire all of the outstanding KCG common stock for $18.50 to $20.00 per share in cash. Virtu also issued a press release confirming that it had made an offer to acquire KCG.

On March 16, an entity identified in the proxy as "Party A" contacted Coleman to inform him that Party A was interested in exploring a strategic combination with KCG. Party A executed a non-disclosure agreement, obtained access to the data room, and held diligence sessions with members of KCG's management team. By March 24, however, Party A had informed Coleman that it was no longer interested in pursuing a possible transaction.

---

[17] *Id.* ¶ 128.

On March 23, the Board instructed Goldman to reach out to other possible bidders for KCG. At a March 29 meeting of the KCG Board, Goldman reported to the Board that it had reached out to six potential bidders. Only one of the six, "Party B," expressed interest in receiving more information about KCG. A few days later, Party B withdrew its expression of interest and did not enter into a non-disclosure agreement with KCG.

### H. Virtu Offers $18.50 Per Share

On April 10, 2017, Virtu offered $18.50 per share in cash to acquire KCG. Virtu's bid letter enclosed a voting agreement requiring Jefferies to support a sale of KCG to Virtu (the "Voting Agreement").[18]

The next morning, Jefferies' Handler emailed Coleman insisting that Virtu would do a deal at $20 per share.[19] Roughly two hours later, Handler emailed Coleman again: "To be crystal clear, I have direct reason to be highly confident

---

[18] Through Goldman, KCG requested Virtu's best and final bid with fully committed financing by April 3, 2017. Virtu stated that it would deliver such a proposal by April 10. The parties agreed that if terms could be agreed-upon, they would seek to enter into a merger agreement no later than April 20, 2017, the date of the KCG's first quarter earnings announcement.

[19] Sec. Am. Compl. ¶ 135 (Handler wrote: "We are incredibly disappointed with your process and what you have achieved. That said, we are highly confident we can get all shareholders 20 dollar per share in cash and be done. This is an outcome we would embrace.").

16

V[irtu] will do a deal at 20 dollars per share in cash today. That is what the [B]oard should be considering."[20]

During a Board meeting on April 11, Coleman and others reported on Jefferies' communications regarding the $20 per share deal. Coleman reiterated that the Restructuring Plan could return $500 million to KCG shareholders within the next five fiscal years, and that the "[v]alue from [the] [R]estructuring [P]lan should be ~25% higher than [Virtu's] bid," with significant additional upside should market volatility return to normal conditions.[21] After this discussion, the KCG Board rejected Virtu's $18.50 offer. The Board instructed management to counter Virtu's offer "with an open ended price per share above $20.00."[22]

## I.     Virtu Increases Its Offer to $20 Per Share

In response to KCG's demand for an open-ended price above $20 per share, on April 12, 2017, Virtu delivered its "best and final" $20 per share bid.[23] Jefferies told KCG's Board Chairman Charles E. Haldeman, Jr. "that a $20 price per share would be embraced by Jefferies."[24]

---

[20] *Id.* (second alteration added).

[21] *Id.* ¶ 138 (third and fourth alteration added).

[22] *Id.*

[23] *Id.* ¶ 140.

[24] *Id.*

At a Board meeting held that same day, all Board members but Coleman voted in favor of a counter-offer of $20.21 per share—KCG's book value at the close of the first quarter of 2017. Coleman opposed the counteroffer because it "was still too low."[25] Yet Coleman promised to support the offer if Virtu could eliminate "closing risks, particularly personnel risks and the retention pool . . . ."[26]

The next morning, Coleman delivered KCG's $20.21 counteroffer stating that the Board conditioned its approval of the merger on Virtu's agreement to a compensation and retention pool for KCG's employees. That afternoon, Coleman updated Haldeman on his compensation negotiations with Cifu. Haldeman asked if Coleman had heard anything from Virtu about price; Coleman responded that he had not. The next morning, Haldeman emailed Coleman, "[p]erhaps you can get the comp issued resolved and *then* you can resolve the price issue."[27]

By April 15, 2017, Virtu had yet to agree to a compensation proposal to Coleman's liking. Haldeman encouraged him to keep negotiating. On April 17, 2017, Coleman informed the Board that he was still negotiating the compensation pool and waiting for a response to the latest counteroffer.

---

[25] *Id.* ¶ 142.

[26] *Id.*

[27] *Id.* ¶ 145 (emphasis in Complaint).

After Cifu finally delivered Virtu's proposal on the compensation and retention pool, Coleman reported to Haldeman that "[t]hese numbers won't hold it together. I see no reason to hang out . . . . We have given on every issue."[28] At Haldeman's suggestion, Coleman created an exhibit illustrating outstanding compensation issues, which depicted a $13 million difference on the amount of bonus compensation for KCG's top management (close to the $13.5 million difference between KCG's $20.21 counter-offer and Virtu's $20 bid). Later that afternoon, Virtu rejected KCG's $20.21 counteroffer. That evening, Cifu reached an agreement with Coleman regarding the compensation pool, and Coleman emailed Haldeman, "[s]ounds like we have a deal on comp[.]"[29] Despite Virtu's earlier *rejection* of the $20.21 counteroffer, Haldeman thought this was good news. He responded: "[G]reat news. Thank you for your understanding on this. The Board is very appreciative on this."[30]

At the April 19, 2017 meeting, the Board unanimously approved Virtu's $20 offer subject to Goldman's delivery of a fairness opinion. Later that evening, Jefferies and Virtu also executed their Voting Agreement.

---

[28] *Id.* ¶ 152.

[29] *Id.* ¶ 155 (internal quotation marks omitted).

[30] *Id.* (alteration in original).

After the Board meeting, Coleman revised KCG's projections downward. Approximately six hours after the Board meeting ended, Coleman's management team circulated new five-year projections (the "Revised Projections") for KCG's standalone value under the Restructuring Plan. The Revised Projections differed from the projections that Coleman presented to the Board at the March 15 and April 11, 2017 Board meetings. The Revised Projections (i) lowered KCG's 2017 net revenue forecast by 2.6% and its 2017 adjusted EBITDA forecast by 21.8%; (ii) cut adjusted EBITDA by $28 million for the terminal year; (iii) cut 2017 adjusted net income by 42.8% from the April 11 projections; and (iv) shrunk KCG's projections for net revenue, adjusted EBITDA, adjusted net income and book value for all five years. Coleman requested that the directors (the "Director Defendants")[31] approve the changes reflected in the Revised Projections that evening to permit KCG to announce the merger before the Board's self-imposed deadline of April 20, 2017. The Director Defendants approved them by email.

Goldman used the Revised Projections to change the assumptions underlying its discounted cash flow ("DCF") analysis. Due to the revisions, Virtu's $20 bid moved from the bottom to the middle of the DCF range.

---

[31] The Director Defendants are Debra J. Chrapaty, Coleman, Peter R. Fisher, Haldeman, Kern, Milde, John C. (Hans) Morris, Rampell, Daniel F. Schmitt, Laurie M. Shahon, Colin Smith, Tookes, and Adrian Weller.

Goldman circulated its fairness opinion to the Board at 5:05 a.m. on April 20, 2017. The Board met at 6:30 a.m., and by 7:00 a.m., the Board had approved the merger.

Later on April 20, 2017, KCG issued a press release announcing the merger. The press release announced that the $20 per share merger consideration represented a premium of approximately 45.7% over the unaffected stock price. This premium was higher than the median premium in similar transactions for each of the last five years, according to the press release. The merger consideration also represented a premium of approximately 12.7% over the closing price of KCG's stock on April 19, 2017, the last trading day before KCG and Virtu entered into the final merger agreement.

In the same press release, KCG also announced negative pre-tax earnings for the first quarter of 2017 and a steep decline in net revenues from roughly $250 million for the first quarter of 2016 to less than $149 million for the first quarter in 2017. The press release further disclosed that, as of March 31, 2017, KCG had a TBV of $18.61 per share and a book value of $20.21 per share.

### J. The Proxy and the Preliminary Injunction Proceedings

On June 1, 2017, KCG filed a definitive proxy statement in connection with the stockholders' vote on the merger. The next day, former plaintiff Herbert Greenway, a KCG stockholder, commenced this litigation against each of the

21

Director Defendants, KCG, Virtu, Virtu subsidiary Orchestra Merger Sub, Inc., and Jefferies. Along with claims for breach of fiduciary duty and aiding and abetting, Greenway's initial complaint challenged the merger under 8 *Del. C.* § 203 ("Section 203").

On June 9, 2017, this Court granted expedited discovery on the Section 203 claim alone.[32] After expedited discovery, which included document production and four depositions, KCG issued a new proxy (the "Proxy")[33] to moot the Section 203 claim. Greenway's counsel then withdrew the preliminary injunction motion on June 30, 2017.

According to KCG, at the rescheduled vote held on July 19, 2017, 75.5% of KCG's shares, excluding the interested shares, voted in favor of the merger. The merger closed on July 20, 2017.

### K. Post-Merger Sale of BondPoint

On June 2, 2017—the day after KCG issued the original proxy—Virtu told Jefferies that Virtu "would be in touch" to move forward a sale of BondPoint.[34]

---

[32] *See Greenway v. KCG Hldgs., Inc.*, C.A. No. 2017-0421-JTL (Del. Ch. June 8, 2017) (TRANSCRIPT). The disclosure claims that the plaintiff now asserts arose after expedited discovery and did not appear in the original complaint evaluated for the purpose of Greenway's motion to expedite. *Compare* Dkt. 1, Verified Class Action Compl. ¶¶ 102–110, *with* Sec. Am. Compl. ¶¶ 194–217.

[33] Dkt. 164, Individual Defs.' Opening Br. in Supp. of Their Mot. to Dismiss ("Dir. Defs.' Opening Br.") Ex. A.

[34] Sec. Am. Compl. ¶ 22 n.2.

Jefferies gave Intercontinental Exchange, Inc. ("ICE") a BondPoint pitch book six days later—before the originally scheduled stockholder vote. On October 24, 2017, Virtu announced an agreement to sell BondPoint to ICE for $400 million in cash. The sale closed on January 2, 2018. Jefferies acted as Virtu's financial advisor on the sale. Virtu received $276 million in after-tax proceeds, paid Jefferies a $7 million fee, and applied the rest to pay down its merger-related debt.

## L. Procedural Posture

On February 14, 2018, Chester County Employees' Retirement Fund ("Plaintiff") filed the first amended complaint, which the defendants ("Defendants") moved to dismiss. In response, on July 16, 2018, Plaintiff filed the second amended complaint[35] and Defendants renewed their motion to dismiss. The parties completed briefing on November 9, 2018,[36] and the Court held oral argument on March 20, 2019.[37]

---

[35] Dkt. 155.

[36] Dkt. 163, Virtu Defs.' Opening Br. in Supp. of Their Mot. to Dismiss ("Virtu Defs.' Opening Br"); Dir. Defs.' Opening Br.; Dkt. 166, Jefferies' Opening Br.; Dkt. 174, Pl.'s Answering Br. in Opp'n to Defs.' Mots. to Dismiss ("Pl.'s Ans. Br."); Dkt. 183, Virtu Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss; Dkt. 184, Jefferies' Reply Br.; Dkt 187, Individual Defs.' Reply Br. in Supp. of Their Mot. to Dismiss ("Dir. Defs.' Reply Br.").

[37] Dkt. 196.

## II. LEGAL ANALYSIS

The Complaint asserts four causes of action. In Count I, Plaintiff claims that the Director Defendants breached their fiduciary duties. In Count II and Count III, Plaintiff claims that Virtu and Jefferies respectively aided and abetting in the Director Defendants' breach of fiduciary duties. In Count IV, Plaintiff claims that Virtu and Jefferies engaged in a civil conspiracy to acquire KCG.

Defendants have moved to dismiss each count pursuant to Court of Chancery Rule 12(b)(6). The Court will grant a motion to dismiss under Rule 12(b)(6) only if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[38] When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . [and] draw all reasonable inferences in favor of the plaintiff."[39] The Court need not "accept every strained interpretation of the allegations,"[40] or "credit conclusory allegations that are not supported by specific facts . . . ."[41]

---

[38] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[39] *Id.* (alterations added).

[40] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[41] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

## A. Breach of Fiduciary Duties

Because KCG stockholders received cash for their shares, the merger is presumptively subject to enhanced scrutiny[42] unless pursuant to *Corwin* Defendants can demonstrate that the merger "has been approved by a fully informed, uncoerced majority of the disinterested stockholders."[43]  Plaintiff argues that the stockholder vote was not fully informed and that enhanced scrutiny, rather than the business judgment standard of review, therefore applies.

### 1. The stockholder vote was not fully informed.

A plaintiff challenging the sufficiency of disclosures in order to avoid business judgment review under *Corwin* bears the burden of pleading a disclosure deficiency.[44]

"At the pleading stage, [the fully informed directive] requires [the Court] to consider whether Plaintiff's complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[45]  The inquiry is fact-intensive, and the Court

---

[42] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 184 (Del. 1986).

[43] 125 A.3d at 306.

[44] *Morrison v. Berry*, 191 A.3d 268, 282 & n.60 (Del. 2018), *as revised* (July 27, 2018) (favorably citing *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017)).

[45] *Id.*; *accord Malpiede*, 780 A.2d at 1086–87.

should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law.[46]

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[47] Stated differently, "an omitted fact is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"[48]

"Just as disclosures cannot omit material information, disclosures cannot be materially misleading."[49] "[O]nce defendants travel[] down the road of partial disclosure of the history leading up to the Merger . . . they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those

---

[46] *See, e.g.*, *McMullin v. Beran*, 765 A.2d 910, 926 (Del. 2000) (reversing order granting defendants' motion to dismiss where "answer[ing] the complaint, discovery and a trial may all be necessary to develop a complete factual record before deciding whether, as a matter of law, the . . . [d]irectors breached their [disclosure] duty . . . ."); *Branson v. Exide Elecs. Corp.*, 1994 WL 164084, at *3 (Del. Apr. 25, 1994) (TABLE) ("Whether or not a statement or omission in an offering prospectus was material is a question of fact that generally cannot be resolved on a motion to dismiss, but rather it must be determined after the development of an evidentiary record."); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *10 (Del. Ch. Jan. 18, 1996) (declining to rule that an omission was immaterial as a matter of law and noting that "[a] question of materiality is difficult to treat as a question of law on a motion to dismiss").

[47] *Morrison*, 191 A.3d at 282 (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[48] *Id.* at 283 (quoting *Rosenblatt*, 493 A.2d at 944).

[49] *Id.*

26

historic events."[50]  "Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[51]

The Complaint identifies multiple categories of deficient disclosures.  Three of the five identified categories demonstrate that it is reasonably conceivable that the stockholder vote was not fully informed.

### a.    BondPoint and its effect on KCG's TBV

The Proxy discloses that, during early discussions between Jefferies and Virtu, "Handler expressed his view that, in the event Virtu were to make a proposal,

---

[50] *Id.* (citing *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1280 (Del. 1994)); *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018) ("Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression."); *In Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 488 (Del. Ch. 2002) ("When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts."); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 17.2[b][3][a], at 17-13–17-14 (3d ed. 2019) ("Although the board generally is not required to disclose all of the 'bends and turns in the road' in summarizing a proposed transaction, the Delaware Supreme Court has suggested that, once a board travels down the path of describing its process, it has a duty to provide a full and fair characterization of events."); 2 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 212.04[C], at 7-75 (6th ed. 2014) ("[I]f corporate fiduciaries volunteer information, even where there is no duty to disclose, they must do so truthfully and candidly.").

[51] *Appel*, 180 A.3d at 1064 (quoting Welch, *supra*, at 7-78–7-79).

Virtu should take into account KCG's tangible book value per share, which, following certain divestitures, could exceed $20 per share."[52]

Plaintiff argues that this disclosure is incomplete and materially misleading because it does not mention the specific asset Handler proposed divesting—BondPoint. The language "certain divestures" creates the misleading impression that Handler's proposal was vague or undeveloped. By contrast, the Complaint alleges that: Jefferies specifically proposed that Virtu divest BondPoint post-acquisition; the BondPoint divesture became a working assumption in Virtu's acquisition strategy; Jefferies provided to Virtu confidential, BondPoint-specific information to develop that strategy; and Virtu ultimately followed through with that strategy. This was not a vague or undeveloped idea as the Proxy language intimates. The omitted information therefore renders the Proxy materially misleading on this point.

Plaintiff also argues that the Proxy's "could exceed $20 per share" language understates the value Jefferies relayed to Virtu. Jefferies' Yavorsky concluded that BondPoint's sale would likely yield at least $200 million in proceeds (it ultimately exceeded that amount) and raise KCG's TBV more than $2.20 per share from $18.79 as of November 30, 2016 to between $21 and $21.50 per share.[53] Handler then

---

[52] Proxy at 24.

[53] Sec. Am. Compl. ¶ 197.

informed Virtu that "adjusted for the sale of BondPoint," KCG's TBV "would be *at least $21 per share*."[54]  Given the allegations, the "could exceed $20 per share" disclosure is materially misleading.  Also, for the stockholders, this undisclosed information sheds light on "whether accepting the merger price is a good deal in comparison with remaining a shareholder and receiving the future expected returns of the company."[55]

In response to these points, the Director Defendants contend that KCG had no intention of selling BondPoint, that disclosing data would be speculative and would have risked stockholder confusion, and that the Board was unaware of the details of the BondPoint proposal in any event.  The fundamental problem with all of these arguments is that Director Defendants chose to disclose Handler's view as expressed to Virtu.  Having traveled down the road of partial disclosure, and chosen to disclose some information regarding Handler's early proposal regarding "certain divestitures," Defendants were obligated to disclose fully, fairly, and completely.

### b. Coleman's objection to the merger price and change of position

Plaintiff alleges that Coleman believed that Virtu's $20 per share offer undervalued KCG and should have been rejected, voted against the Board's $20.21

---

[54] *Id.* ¶ 72 (emphasis added).

[55] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *15 (Del. Ch. Aug. 18, 2006).

counterproposal because it "was still too low," and reversed course to support the merger at a $20 per share price after negotiating a compensation pool to his satisfaction.[56] Plaintiff argues that Coleman's initial position, potential conflicts, and change in position are material and should have been disclosed to stockholders.

In response, Defendants note that the Proxy reflects the Board's concern regarding employee retention, and they say that as a general matter, the Board was not obligated to disclose the "play-by-play" details that led to the merger.[57] They also cite as supportive a case in which the Court deemed the fact of a director's abstention as immaterial to a stockholder vote.[58] These arguments are largely beside the point and do not meaningfully grapple with the cruces of the deficiencies Plaintiff identifies with respect to Coleman, including Coleman's unique position at KCG, his potential conflicts, and the role those conflicts might have played in his change of position.

---

[56] Sec. Am. Compl. ¶¶ 6–7, 107, 109, 138, 142.

[57] Dir. Defs.' Opening Br. at 36–38 (citing *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511–12 (Del. Ch. 2010)).

[58] *Id.* at 37 (citing *In re Orchid Cellmark Inc. S'holder Litig.*, 2011 WL 1938253, at *4, *12 (Del. Ch. May 12, 2011)). Defendants also point to *Huff Energy Fund v. Gershen*, 2016 WL 5462958, at *15 (Del. Ch. Sept. 29, 2016), for the proposition that Defendants had no obligation to disclose that the April 12, 2017 Board vote was less than unanimous. *Huff Energy* is inapposite. In that case, the Court held that the corporation was not obligated to disclose the fact of a director's abstention from a dissolution vote. By contrast, Plaintiff alleges that Coleman, an interested director, voted against the counteroffer because it was too low, but then voted in favor of a lower $20 offer after he negotiated the compensation pool.

30

A comparison of the facts of this case to those in *Appel v. Berkman*[59] and *Gilmartin v. Adobe Resources Corporation*[60] reveals the omitted information to be material.

In *Appel*, the Delaware Supreme Court held that the target chairman's objections to the price and timing of a merger were material,[61] because the chairman's position gave him a "unique understanding" and "in-depth knowledge about" the company's business.[62] Like the chairman in *Appel*, Coleman's position as CEO gives him a unique understanding and in-depth knowledge about the company's business.

In *Gilmartin*, this Court held that where key insiders change their views concerning the merger, the proxy should disclose their prior belief and explain why they changed their minds.[63] Like the key insiders in *Gilmartin*, Coleman changed his view concerning the merger in a short period, viewing the $20.21 per share price as too low, but then later voting in favor of a price of $20 per share. Moreover, because Coleman secured a benefit from the acquirer in between his change in

---

[59] 180 A.3d 1055.

[60] 1992 WL 71510 (Del. Ch. Apr. 6, 1992).

[61] 180 A.3d at 1064.

[62] *Id.* at 1059.

[63] 1992 WL 71510, at *13 n.15.

position, the facts of this case weigh more heavily in favor of disclosure than those at issue in *Gilmartin*.

As in *Appel* and *Gilmartin*, Plaintiff has demonstrated that the omitted disclosures speak to more than ordinary play-by-play details. Plaintiff has met its burden of alleging facts to support an inference of a material deficiency in failing to disclose Coleman's objections and potential conflicts surrounding the merger price negotiations.[64]

### c. The projections

The Proxy discloses the Revised Projections forecasting KCG's standalone value under the Restructuring Plan and that the Restructuring Plan was a strategic alternative to the merger.[65] Plaintiff contends that this was insufficient, and argues that the Proxy should have disclosed (i) the more optimistic, earlier projections, and (ii) the circumstances surrounding creation of the Revised Projections.[66] In response, Director Defendants argue that they were "not obligated to disclose any

---

[64] Defendants also attack the factual allegations regarding Coleman's conflict. They contend that Coleman was not negotiating the compensation pool for his personal gain, but rather, to ensure that the company retained employees to remain viable if the merger did not close. Director Defendants might succeed in proving these facts on the merits. At the pleadings stage, however, the Court must make all reasonable inferences in Plaintiff's favor. It is reasonable to infer that Coleman was acting in his own interests, and that this interest—or those of his management team or employees—overtook his duties to the stockholders when he was charged with obtaining the highest deal price. Accepting the allegations as true, that information is material.

[65] Proxy at 37–38.

[66] Pl.'s Ans. Br. at 59–63.

and all extant projections," but rather, only "the final projections relied upon by the Board and its financial advisor."[67]

Delaware law does not support the bright-line rule for which Defendants advocate. Rather, in *In re PNB Holding Co. Shareholders Litigation*, then-Vice Chancellor Strine held that "[i]n the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate."[68] "The word reliable is critical," the Court emphasized.[69] The Court observed that projections might be material where "the circumstances of their preparation support the conclusion that they are reliable enough to aid the stockholders in making an informed judgment."[70]

Thus, under *PNB*, if the circumstances surrounding the preparation of interim projections reveal them to be reliable enough to aid stockholders in making an informed judgment, they should be disclosed, regardless of whether they were the final projections relied upon by the Board.[71] By logical extension, if the

---

[67] Dir. Defs.' Opening Br. at 42–43 (citing cases). The Director Defendants fail to address the meat of Plaintiff's argument—that the Proxy should have disclosed the reason for the Revised Projections.

[68] 2006 WL 2403999, at *15.

[69] *Id.* at *16.

[70] *Id.*

[71] *Id. See also Chen v. Howard-Anderson*, 87 A.3d 648, at 687–89 (Del. Ch. 2014) (applying *PNB* and denying summary judgment where a plaintiff had shown facts suggesting that undisclosed projections were reliable and thus material); *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *13 (Del. Ch. Nov. 30, 2007) ("This

circumstances surrounding the preparation of final projections relied upon by the Board and disclosed to stockholder cast doubt on their reliability, then those circumstances should be disclosed.[72]

Plaintiff has pled facts making it reasonably conceivable that the earlier, more optimistic projections, which were prepared in KCG's ordinary course of business, were in fact reliable and thus material. According to Plaintiff, Coleman presented the five-year projections to the Board during the March 15 Board Meeting. Goldman relied on these projections to create its valuation analyses for the merger that it presented at the March 29 and April 11 Board meetings. Plaintiff alleges that the projections were unhurried, vetted by management, "affirmed by Jefferies and Goldman . . . and relied upon by the Director Defendants . . . ."[73]

---

court has found omissions of certain projections of corporations' future profits to be material if they were reliable."); *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. July 9, 2004) ("When management projections are made in the ordinary course of business, they are generally deemed reliable."), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del. 2005).

[72] *See generally Appel*, 180 A.3d at 1064 ("Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression."); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 129 (Del. Ch. 1986) (recognizing that the disclosure of "'forward looking' information containing either opinions or projections of values . . . may be critical to an informed, reasoned shareholder decision[,]" and noting that "[i]n cases of genuine doubt [as to the certainty of such information], the uncertainty can be mitigated where the 'soft' information is disclosed but qualified with an appropriate cautionary explanation." (citation omitted)).

[73] Pl.'s Ans. Br. at 62.

Plaintiff has also pled facts concerning the circumstances of the preparation of the Revised Projections sufficient to cast doubt on their reliability. Plaintiff alleges Coleman's management team created the Revised Projections at the last-minute—after the Board approved the $20 per share price, and after Coleman secured satisfactory compensation from Virtu.[74] Plaintiff further alleges that the Revised Projections were significantly more pessimistic concerning KCG's standalone value than their immediate prior version.[75]

Accepting those allegations as true, it is reasonably conceivable the earlier projections and the circumstances surrounding the preparation of the Revised Projections would have been viewed as material and should have been disclosed. Developing the factual record on this issue is necessary to make a materiality determination on this issue.

### d. Jefferies' role in the merger negotiations

Plaintiff contends that the Director Defendants breached their duty of disclosure by failing to provide "a full and accurate summary of Jefferies' conduct and influence relating to the merger."[76] In addition to Jefferies' role in orchestrating the BondPoint sale, which states a viable disclosure issue as discussed above,

---

[74] Sec. Am. Compl. ¶ 161.

[75] *Id.* ¶¶ 162–64.

[76] Pl.'s Ans. Br. at 63.

Plaintiff points to the failure to disclose: (i) the extent of Jefferies' pressure on the Board to accept the $20 bid, and (ii) the reason that the Board did not retain Jefferies as a merger advisor.[77]

On the first point, the Proxy includes sufficient detail. It discloses that Jefferies discussed price ranges for Virtu's eventual bid while rejecting any price below $20 per share,[78] met with Coleman in February to discuss Virtu's bid,[79] and later encouraged Coleman to engage with Virtu repeatedly.[80] Further, the Proxy states Jefferies was "highly confident" that Virtu would raise its bid to $20 per share, that Jefferies "would embrace such an outcome," and that the Board should consider such an outcome."[81] This Court has cautioned that "[f]ully informed does not mean infinitely informed . . . . Redundant facts, insignificant details, or reasonable assumptions need not be disclosed."[82] Here, Plaintiff has failed to show that additional facts are material, or would significantly alter the "total mix" of information available on this particular issue.

---

[77] *Id.* at 64–65.

[78] Proxy at 26–28.

[79] *Id.* at 24.

[80] *Id.* at 25, 27.

[81] *Id.* at 27.

[82] *In re Merge Healthcare Inc.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017).

On the second point, the Proxy discloses that the Board considered retaining, but rejected Jefferies as a financial advisor to the merger.[83] Generally, a board need not disclose the "why" for certain actions.[84] Here, the Board did not need to disclose why it did not select Jefferies as its financial advisor, given the other information disclosed. On this point, Plaintiff has failed to meet the material threshold of alleging how additional information would alter the "total mix" of information available.

### e. Goldman's alleged conflicts

Plaintiff alleges that the Proxy omitted financial and other details concerning Goldman's potential conflicts of interests. According to Plaintiff, Goldman's former-Chief Operating Officer had a longstanding relationship with Viola, and that relationship led to Goldman's selection as the lead underwriter of Virtu's IPO. Goldman also had relationships with Virtu's merger financing sources, North Island Holdings, L.P. ("North Island") and Temasek Holdings (Private) Limited ("Temasek"). Also, Plaintiff contends that Goldman's co-investments with Jefferies and the details of those co-investments should have been disclosed.

As to Goldman's alleged conflicts, the Proxy is sufficient. It details that Goldman invests in or provides financial work for Virtu and their affiliates and third

---

[83] Proxy at 25.

[84] *Kahn v. Stern*, 2017 WL 3701611, at *16 (Del. Ch. Aug. 28, 2017), *aff'd*, 183 A.3d 715 (Del. 2018).

parties.[85]  It contains Goldman's compensation for its services for Temasek in the last two years,[86] and further discloses that Goldman has not provided services for North Island or its affiliates in the same two-year period.[87]  It also discloses that "[a]ffiliates of Goldman Sachs also may have co-invested with Jefferies . . . ."[88]

Plaintiff does not provide support to show that Delaware requires a greater level of detail.  Given the Proxy's factual disclosures, the information Plaintiff asserts should have been disclosed would not significantly alter the "total mix" of information available.[89]

### 2. Plaintiff has stated a non-exculpated claim for breach of fiduciary duties under *Revlon*.

For the foregoing reasons, Plaintiff has sufficiently alleged that the stockholders' vote was not fully informed.  *Corwin* is therefore inapplicable and

---

[85] The third-parties include "Leucadia . . ., Temasek . . ., the Republic of Singapore and its agencies or instrumentalities . . ., including the sole shareholder of Temasek, North Island Holdings . . ., which, together with certain of its affiliates, is providing equity financing to Virtu in connection with the merger[.]" Proxy at 43.

[86] *Id*. at 43–44.

[87] *Id*. at 44.

[88] *Id*. at 45.

[89] *See, e.g.*, *English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) (holding that where the disclosures included "past work that both of the Company's financial advisors performed" and "the compensation [the financial advisors] each were entitled to receive for their work on the [t]ransaction . . . , it cannot be said that the [disclosures] omitted facts about past work [the financial advisors] performed . . . that 'would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available' concerning the financial advisors' incentives in connection with the sale process").

Plaintiff's claims are subject to the *Revlon* standard of review. Under *Revlon*, "directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."[90] Furthermore, "directors must maintain 'an active and direct role in the context of a sale of a company from beginning to end.' Part of providing active and direct oversight is becoming reasonably informed about the alternatives available to the company."[91] "Another part of providing active and direct oversight is acting reasonably to learn about actual and potential conflicts faced by directors, management, and their advisors."[92]

KCG's charter contains a provision adopted pursuant to 8 *Del. C.* § 102(b)(7) that shields the Director Defendants from liability for monetary damages for breaching their duty of care.[93] The practical effect of this provision under *In re Cornerstone Therapeutics Inc. Stockholder Litigation* is that Plaintiff must plead a

---

[90] *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *3 (Del. Ch. Apr. 11, 2011).

[91] *In re Rural Metro Corp.*, 88 A.3d 54, 89–90 (Del. Ch. Mar. 7, 2014) (citation omitted); *see also Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994) ("The key features of an enhanced scrutiny test are: (a) a judicial determination regarding the adequacy of the [decision-making] process employed by the directors, including the information on which the directors based their decision; and (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing.").

[92] *Rural Metro*, 88 A.3d at 90.

[93] That charter provision provides: "No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the [Delaware General Corporation Law] as the same exists or may hereafter be amended." Dir. Defs.' Opening Br. Ex. B § 6.

violation of the duty of loyalty or good faith to avoid dismissal of its claims against the Director Defendants.[94]

To meet this standard, Plaintiff argues that the majority of the Director Defendants acted in bad faith by failing to cabin Coleman's conflict or prevent Coleman from downwardly revising the projections.[95]

The Complaint adequately alleges that Coleman's interest in negotiating the compensation pool gave rise to conflicts during Coleman's negotiations of the deal price. The Complaint further alleges that the Director Defendants knew of these conflicts and also knew that Coleman was willing to make them paramount to negotiating a higher deal price. In fact, Plaintiff alleges that Coleman told the Board that "*if* Virtu were to be agreeable with providing comfort on the closing risks, particularly personnel risks and the retention pool, he would work diligently in support of the Board's decision to see the transaction successfully through closing."[96]

---

[94] 115 A.3d 1173, 1179 (Del. 2015). To be clear, "[t]he presence of an exculpatory charter provision does not mean that *Revlon* duties no longer apply. Rather, *Revlon* remains applicable as a context-specific articulation of the directors' duties but directors may only be held liable for a non-exculpated breach of their *Revlon* duties." *Kahn v. Stern*, 2018 WL 1341719, at *1 n.3 (Del. Mar. 15, 2018).

[95] Plaintiff also alleges that the Director Defendants failed to manage Jefferies' conflicts or thoroughly investigate Goldman's conflicts.

[96] Sec. Am. Compl. ¶ 142 (emphasis added).

Yet, rather than cabining Coleman, or limiting his authority to negotiations over the compensation pool, the full Board authorized Coleman to negotiate both the compensation pool *and* the deal price. Haldeman expressly instructed Coleman to "get the comp issued resolved and *then* you can resolve the price issue,"[97] suggesting an understanding that success on the first issue might position KCG to give on the second. Predictably, once Coleman secured the compensation pool that benefitted the officers and directors, the Board agreed to the $20 per share price. Although Virtu had rejected the Board's counteroffer of $20.21, once the negotiations for the compensation pool were finalized, Haldeman was happy. Upon learning from Coleman that he had resolved the compensation pool issue with Virtu, he responded: "[G]reat news. Thank you for your understanding on this. The Board is very appreciative on this."[98]

Then, the Board permitted Coleman to revise the projections downward, which made the $20 per share merger price look more attractive. Plaintiff alleges that the Board approved the Revised Projections at Coleman's request, without any deliberation, over email, and the night before receiving Goldman's fairness

---

[97] *Id.* ¶ 145 (emphasis in original).

[98] *Id.* ¶ 155.

presentation.[99] Defendants attack these allegations as factually inaccurate,[100] but the Court must accept them as true for the purpose of this motion.

Plaintiff's allegations make it reasonably conceivable the Board placed the interests of members of management, who benefited from the compensation pool, above the interests of the stockholders.[101] "A failure to act in good faith may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation[.]"[102] Because it is reasonably conceivable that the Director Defendants placed management's interests ahead of

---

[99] Smith approved the Revised Projections despite missing the prior four Board meetings, and Chrapaty approved them before Haldeman provided her with an update on board discussions and decisions that she had missed.

[100] *See* Dir. Defs.' Opening Br. at 53–54; Dir. Defs.' Reply Br. at 14–15.

[101] *See In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. Feb. 29, 2012) ("[A] range of human motivations . . . can inspire fiduciaries and their advisors to be less than faithful to their contextual duty to pursue the best value for the company's stockholders."); *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless."); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, or, . . . shame or pride.").

[102] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 53 (Del. 2006) (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)); *accord Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (same) (citation omitted). *See also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."); 907 A.2d at 753 ("Bad faith has been defined as 'authorizing a transaction for some purpose *other than* a genuine attempt to advance corporate welfare . . . .'" (emphasis original) (citation omitted)), *aff'd*, 906 A.2d 27 (Del. 2006).

their obligation to maximize stockholder value, the Complaint supports an inference of bad faith, and states a non-exculpated claim.

Plaintiff makes other arguments to show bad faith as to the majority of the Director Defendants. For example, Plaintiff contends that the Board should have prohibited or better managed the behind-the-scenes negotiations between Jefferies and Virtu, which undermined the Board's negotiations with Virtu concerning the deal price.[103] Plaintiff points to numerous facts suggesting that the Directors Defendants were on notice of Jefferies' conduct.[104] The Director Defendants respond by stating that at first they did not know of the full extent of Jefferies conduct; once they knew, they tried to exclude Jefferies from the process.[105] The allegations support a pleadings-stage inference that the Director Defendants

---

[103] Plaintiff contends that the Board's failure to intervene and stop the negotiations was unreasonable. A reasonable inference from the facts alleged is that Jefferies played for both sides to facilitate a deal. This allegedly includes pushing the Board into a deal, while also alerting the Board that Virtu would submit a higher bid for $20 per share.

[104] *See* Pl.'s Ans. Br. at 33–34 ("On February 21, 2017, Handler advised Coleman that Virtu would be making an acquisition proposal. On March 7, Handler showed Coleman a text he received from Cifu. On March 16, Jefferies asked KCG about Virtu's March 16 letter before Jefferies should have known about it. On March 17, Coleman learned that Jefferies met with Virtu on February 14 and that Yavorsky had been communicating with Molluso. On March 19, McCarthy probed Yavorsky as to how J.P. Morgan knew about the Restructuring Plan. On April 10, Virtu delivered a draft voting agreement for Jefferies along with its 'best and final' offer. On April 11, Handler told Coleman and Friedman told Haldeman Virtu would increase its bid to $20 per share. On April 19, Virtu and Jefferies executed the Voting Agreement, before the Board approved the Merger." (internal footnotes and bullet points omitted)).

[105] *See* Dir. Defs.' Reply Br. at 15–17, 21–23.

breached their duty of care by failing to employ a reasonable process that managed Jefferies' influence. Whether the Director Defendants' actions in this regard rose to the level of bad faith or merely state a claim for breach of the duty of care is a close call.[106] The Court need not make this call in light of the sufficiency of Plaintiff's other allegations.

## B. Aiding and Abetting

A party is liable for aiding and abetting when it knowingly participates in any fiduciary breach.[107] As established above, Plaintiff has stated a claim against the Director Defendants for a breach of their fiduciary duties. Jefferies and Virtu argue, however, that the Complaint against them must be dismissed because Plaintiff failed to allege knowing participation.

An aider and abettor knowingly participates in a breach when it acts "with the knowledge that the conduct advocated or assisted constitutes such a breach."[108] "[K]nowing participation in a board's fiduciary breach requires that the third party

---

[106] The charter provision does "not vitiate the Board's obligation to adhere to its fiduciary obligation to proceed with due care, it simply proscribe[s] monetary liability in the event they failed to do so." *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 874 (Del. 2015).

[107] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995) ("A claim for aiding and abetting requires the following three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by [the non-fiduciary]."). *See also RBC*, 129 A.3d at 861–62.

[108] *Rural Metro*, 88 A.3d at 97 (citation and internal quotation marks omitted); *see also In re Comverge, Inc. S'holders Litig.*, 2014 WL 6686570, at *18 (Del. Ch. Nov. 25, 2014) (knowing participation "requires an understanding between the parties with respect to their complicity. . .").

act with the knowledge that the conduct advocated or assisted constitutes such a breach."[109] Stated differently, "[i]f the third party knows that the board is breaching its duty . . . and participates in the breach by misleading the board or creating the informational vacuum, then the third party can be liable for aiding and abetting."[110] This standard requires well-pled facts that the aider and abettor acted with "scienter," or "knowingly, intentionally or with reckless indifference."[111]

### 1. Against Jefferies

In *RBC Capital Markets, LLC v. Jervis*, the Delaware Supreme Court upheld this Court's finding that a financial advisor aided and abetted in a breach of fiduciary duties "by misleading the board or creating the informational vacuum" that led to the fiduciary breach.[112]

Relying on *RBC*, Plaintiff alleges that Jefferies knowingly participated in the Director Defendants' breach of fiduciary duties by misleading them and creating an informational vacuum. Plaintiff alleges that Jefferies negotiated with Virtu for months and committed to a $20 per share price before notifying the Director Defendants of Virtu's interest. Critically, during that time, Jefferies used allegedly

---

[109] *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *13 (Del. Ch. Aug. 29, 2018) (alteration added) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001)).

[110] *Id.* (citation omitted).

[111] *Id.* (citation omitted).

[112] 129 A.3d 816, 862 (Del. 2015).

confidential KCG information to develop a divestiture strategy concerning BondPoint, but failed to inform KCG's Board. Then, after the Board demanded Jefferies' actual communications with Virtu, Jefferies provided to KCG a "sanitized" timeline. The timeline omitted various information that Plaintiff views as critical.[113] According to Plaintiff, failing to contemporaneously inform the Board of its dealing with Virtu and later preparing the misleading timeline, effectively "strip[ped] the Board of its negotiating leverage" in the Board's dealings with Virtu.[114] These facts are sufficiently analogous to those at issue *RBC* and give rise to an inference of knowing participation at the pleadings stage.

## 2. Against Virtu

Plaintiff's allegations as to Virtu's knowing participation are slightly less compelling than the allegations regarding Jefferies' knowing participation. Still, at the pleadings stage, they suffice. Plaintiff alleges that Virtu worked with Jefferies to pressure "the Board to approve the Merger for a less-than-value-maximizing price,"[115] accepted confidential information concerning BondPoint to develop its

---

[113] Sec. Am. Compl. ¶¶ 119–21.

[114] Pl.'s Ans. Br. at 83.

[115] The Complaint specifically alleges that during its negotiations with KCG, Virtu worked with Handler to pressure KCG behind the scenes. *See* Sec. Am. Compl. ¶¶ 90–93, 103–105, 110, 131, 140. Virtu's Viola and Cifu discussed how Coleman would be "overwhelmed by [H]andler" in negotiating the merger price. *Id.* ¶ 92.

acquisition strategy,[116] and exploited Coleman's conflict to obtain his support of the merger price.[117] This is sufficient to survive the pleadings stage on an aiding and abetting claim under Delaware law.[118]

### C. Civil Conspiracy

Count IV asserts a claim of civil conspiracy. It has been said that "aiding and abetting claims represent a context-specific application of civil conspiracy law."[119] That is because a plaintiff typically alleges that the bidder and *the target's board*

---

[116] On multiple occasions, Jefferies presented KCG's valuation to Virtu, including the adjustments for a BondPoint sale. *Id.* ¶¶ 72, 81. Evidence from one such meeting suggests that Jefferies gave Virtu non-public, confidential information. *Id.* ¶ 85. Virtu used this information to create financial models to structure its bid. *Id.* ¶ 77.

[117] Virtu knew that Coleman did not support Virtu's $20 per share offer because Coleman told Virtu that this price "significantly undervalue[d] KCG." *Id.* ¶ 116 (emphasis omitted). Thereafter, Virtu closed the outstanding gap between the $20.21 counteroffer and Virtu's $20 bid. Virtu offered $13 million in additional bonus compensation pool funds that secured Coleman's approval of the merger. *Id.* ¶¶ 153, 155, 157.

[118] *See Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *16 (Del. Ch. Mar. 26, 2018) (finding that a plaintiff adequately alleged knowing participation where an investor allegedly exploited a director's conflict of interest by convincing that director to issue stock at an unfairly low price); *RBC*, 129 A.3d at 862 ("[A] bidder may be liable to the target's stockholders [for aiding and abetting] if the bidder attempts to create or exploit conflicts of interest in the board" (citing *Malpiede*, 780 A.2d at 1097)); *Zirn v. VLI Corp.*, 1989 WL 79963, at *6 (Del. Ch. July 17, 1989) (finding that the complaint stated an aiding and abetting claim where it was reasonably inferable that buyer was aware of the sellers' directors conflict of interest and gained some advantage as a result); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984) ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."), *aff'd*, 575 A.2d 1131 (Del. 1990).

[119] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) (citing cases).

conspired to harm stockholders. By contrast, in this case, Plaintiff alleges that Virtu *and Jefferies* conspired to harm KCG's stockholders.

"The elements for civil conspiracy under Delaware law are: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[120] "The torts of civil conspiracy and aiding and abetting, while similar, address different claims."[121]

Virtu and Jefferies argue that Count IV should be dismissed because the Plaintiff has not alleged a predicate tort sufficient to satisfy the first element. This argument fails because the Complaint adequately alleged a claim for aiding and abetting a breach of fiduciary duty.

Plaintiff has adequately alleged the other elements of conspiracy also. It is reasonable to infer from the facts alleged that: Virtu and Jefferies agreed upon a merger price as of the February 16, 2017 meeting of their CEOs;[122] they agreed to

---

[120] *Aeroglobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005) (citing *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149 (Del. 1987)).

[121] *In re Bracket Hldg. Corp. Litig.*, 2017 WL 3283169, at *12 (Del. Super. July 31, 2017).

[122] A failure to identify an explicit agreement does not foreclose a finding of a combination where the plaintiff makes a showing that the alleged conspirators had a "meeting of the minds" or shared a "common design." *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018). The sequence of events leading up to the February 16 meeting followed by Jefferies' conduct thereafter are sufficient facts upon which to infer a meeting of the minds to support Plaintiff's claim of civil conspiracy. *See, e.g.*, Sec. Am. Compl. ¶ 79 (while negotiating with Virtu, Handler stated that he "[w]ant[ed] $20 per share"); *id.* ¶ 82 (Virtu recognized that Jefferies "[c]learly wants to do something" and had "[f]ocused on a price with a 2 handle"); *id.* ¶ 83 (the day before the CEOs' February 16 meeting, Molluso presented Cifu and Viola with the bid and price range

sell BondPoint post-merger; they worked together to achieve that goal, and, along the way, interfered with the Director Defendants' exercise of their fiduciary duties, and exploited confidential KCG information concerning BondPoint. It is also reasonably conceivable that this conduct resulted in damage to the stockholder class.

## III.   CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is DENIED.

---

from Jefferies, to which Viola responded, "[w]e can make a deal happen."); *id.* ¶ 86 (to KCG officer Steffen Parratt, "Virtu's communications with KCG concerning price were 'more like confirmatory diligence than bid-forming'"); *id.* ¶ 135 (On April 11, Hander emailed Coleman: "[W]e are highly confident we can get all shareholders 20 dollar per share in cash and be done. This is an outcome we would embrace."); *id.* ("To be crystal clear, I have direct reason to be highly confident V[irtu] will do a deal at 20 dollars per share in cash today. That is what the board should be considering."); *id.* ¶ 136 (J.P. Morgan communicated to Goldman that "Virtu was willing to negotiate up to $20.00 per share."); *id.* ¶ 156 (Coleman testified at his deposition that Virtu's refusal to raise its bid was "not a shock" to him because Virtu had a voting agreement with Jefferies).