IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEPHEN APPEL, individually and on behalf of all others similarly situated, | § § § | No. 316, 2017 |
| | § | |
| Plaintiff Below, | § | Court Below: Court of Chancery |
| Appellant, | § | of the State of Delaware |
| | § | |
| v. | § | C.A. No. 12844–VCM |
| | § | |
| DAVID J. BERKMAN, STEPHEN J. CLOOBECK, RICHARD M. DALEY, FRANKIE SUE DEL PAPA, JEFFREY W. JONES, DAVID PALMER, HOPE S. TAITZ, ZACHARY D. WARREN, and ROBERT WOLF, | § § § § § § § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: January 17, 2018
Decided: February 20, 2018

Before **STRINE**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Jeremy Friedman, Esquire, Spencer Oster, Esquire, David Tejtel, Esquire, FRIEDMAN OSTER & TEJTEL PLLC, New York, New York; Peter B. Andrews, Esquire, Craig J. Springer, Esquire (*argued*), David M. Sborz, ANDREWS & SPRINGER LLC, Wilmington, Delaware, *Attorneys for Appellant, Stephen Appel and on behalf of all others similarly situated*.

Mark A. Kirsch, Esquire, Jefferson E. Bell, Esquire, GIBSON, DUNN & CRUTCHER LLP, New York, New York; Brian M. Lutz, Esquire, GIBSON, DUNN & CRUTCHER LLP, San Francisco, California; Raymond J. DiCamillo, Esquire (*argued*), Elizabeth DeFelice, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Appellees, David J. Berkman, Richard M. Daley, Frankie Sue Del Papa, Jeffrey W. Jones, David Palmer, Hope S. Taitz, Zachary D. Warren, and Robert Wolf*.

Stephen B. Brauerman, Esquire (*argued*), Sara E. Bussiere, Esquire, BAYARD, P.A., Wilmington, Delaware, *Attorneys for Appellee, Stephen J. Cloobeck*.

**STRINE**, Chief Justice:

# I.

Diamond Resorts International's board of directors recommended to its stockholders that they sell their shares to a private equity buyer, Apollo Global Management, for cash in a two-step merger transaction involving a front-end tender offer followed by a back-end merger under Section 251(h). The proxy statement had a detailed recitation of the background leading to the merger, and the reasons for and against it. But notably absent from that recitation was that the company's founder, largest stockholder, and still Chairman, Stephen J. Cloobeck, had abstained from supporting the procession of the merger discussions, and from ultimately approving the deal, because:

> he was disappointed with the price and the Company's management for not having run the business in a manner that would command a higher price, and that in his view, it was not the right time to sell the Company.[1]

On a motion to dismiss, the Court of Chancery held that the complaint challenging the merger should be dismissed because the stockholders' acceptance of the first-step tender offer was fully informed, rejecting the plaintiffs' argument that the omission of the Chairman's reasons for abstaining rendered the proxy statement materially misleading.

---

[1] Minutes of Diamond Resorts' Board of Directors Meeting (June 25, 2016), App. to Appellant's Opening Br. 180; Minutes of Diamond Resorts' Board of Directors Meeting (June 26, 2016), App. to Appellant's Opening Br. 183 (cited in Appellant's Opening Br. 9).

In this appeal, the sole issue is whether that ruling was correct. We agree with the plaintiffs that it was not, and that the defendants' argument that the reasons for a dissenting or abstaining board member's vote can never be material is incorrect. Precisely because Delaware law gives important effect to an informed stockholder decision,[2] Delaware law also requires that the disclosures the board makes to stockholders contain the material facts and not describe events in a materially misleading way.[3] Here, the founder and Chairman's views regarding the wisdom of selling the company were ones that reasonable stockholders would have found material in deciding whether to vote for the merger or seek appraisal, and the failure to disclose them rendered the facts that were disclosed misleadingly incomplete. Therefore, we reverse the order dismissing the plaintiffs' claims.

## II.

Cloobeck founded Diamond Resorts, a hospitality and vacation ownership company, in 2007, and served as its Chairman and CEO from its inception through

---

[2] *E.g.*, *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 305–06 (Del. 2015) ("[T]he business judgment rule is . . . the appropriate standard of review for a post-closing damages action when a merger that is not subject to the entire fairness standard of review has been approved by a fully informed, uncoerced majority of the disinterested stockholders."); *In re Wheelabrator Techs., Inc. Shareholders Litig.*, 663 A.2d 1194, 1203 (Del. Ch. 1995) ("Approval by fully informed, disinterested shareholders . . . invokes the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction.") (internal citations omitted).

[3] *E.g.*, 2 STEPHEN A. RADIN, THE BUSINESS JUDGMENT RULE, at 1715 (6th ed. 2009) ("A board can breach its fiduciary duty of disclosure under Delaware law in a number of ways—by making a false statement, by omitting a material fact, or by making partial disclosure that is materially misleading." (citing *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 376 (Del. Ch. 1998)).

December 2012.[4] After Diamond Resorts went public in 2013, Cloobeck continued to serve as its Chairman.[5]

In February 2016, the Diamond Resorts board formed a strategic review committee to review "strategic alternatives," and in March 2016 that committee began a public sales process.[6] During the week of April 25, 2016, "the Company received written indications of interest to acquire the Company from five parties" ranging from a low of $23 per share to a high of $33 per share.[7] And throughout May and June, the company's management conducted due diligence with potential bidders.[8] On June 23, 2016, two bids surfaced: Apollo's for $30.25 per share, and "Sponsor B's" for $27 to $29 per share, conditioned upon additional diligence.[9]

On June 26, 2016, the Diamond Resorts board voted in favor of the company's sale to Apollo.[10] But Cloobeck abstained from that vote. In not one, but two board meetings, Cloobeck said that he was abstaining because mismanagement of Diamond Resorts had negatively affected the sale price and it was therefore not the right time to sell the company. As recorded in both the June 25th and 26th board meeting minutes, Cloobeck expressed to the board that:

---

[4] Verified Class Action Compl. (Oct. 21, 2016), App. to Appellant's Opening Br. 17–18, 20.
[5] *Id.* at 18.
[6] Schedule 14D-9 Solicitation/Recommendation Statement (July 14, 2016), App. to Appellant's Opening Br. 208–09.
[7] *Id.* at. 210.
[8] *Id.* at. 211–13.
[9] *Id.* at. 213.
[10] *Id.* at 214.

he was disappointed with the price and the Company's management for not having run the business in a manner that would command a higher price, and that in his view, it was not the right time to sell the Company.[11]

But, in its lengthy Schedule 14D-9 Solicitation/Recommendation Statement (the "14D-9") recommending that stockholders tender their shares to Apollo, the board did not disclose to stockholders the reasons for Cloobeck's abstention.[12] Instead, the 14D-9 simply stated that "[a]ll of the directors voted in favor of [the transaction] with the exception of the Company's chairman, who abstained."[13] As to Cloobeck's position on tendering his own shares, the 14D-9 stated that, "[t]o the Company's knowledge, the chairman of the board of directors has not yet determined whether to tender . . . his shares."[14] Cloobeck is the same Chairman who the board described in the following way to stockholders in its most recent annual election proxy before the tender offer:

---

[11] Minutes of Diamond Resorts' Board of Directors Meeting (June 25, 2016), App. to Appellant's Opening Br. 180; Minutes of Diamond Resorts' Board of Directors Meeting (June 26, 2016), App. to Appellant's Opening Br. 183 (cited in Appellant's Opening Br. 9). The plaintiffs note that Cloobeck's concerns echoed those of the board's financial advisor that there was a "material disconnect between the Company's fundamental value and the observed public market value." Appellant's Opening Br. 7. And, although the 14D-9 described the board's consideration of a "perceived disconnect between the market value of the Company and the potential value of the underlying business" when it initially decided to review strategic alternatives, the 14D-9 did not mention the company's financial advisor's reiteration of that concern at the May 2, 2016 board meeting. Schedule 14D-9 Solicitation/Recommendation Statement (July 14, 2016), *supra* note 6, at 209, 211.

[12] Schedule 14D-9 Solicitation/Recommendation Statement (July 14, 2016), *supra* note 6, at 193–248.

[13] *Id.* at 208.

[14] *Id.* at 220.

4

Mr. Cloobeck[] [has a] unique understanding of the opportunities and challenges that we face and . . . in-depth knowledge about our business, including our customers, operations, key business drivers and long-term growth strategies, derived from his 30 years of experience in the vacation ownership industry and his service as our founder and former Chief Executive Officer.[15]

On August 8, 2016, the plaintiffs served a Section 220 demand on the company, asking to inspect its books and records.[16] About a week later, Cloobeck tendered his 15 percent of the Diamond Resorts shares.[17] Then, on September 2nd, having exceeded the 50 percent level of ownership necessary to consummate the transaction's back-end merger under Section 251(h) without a stockholder vote, Apollo consummated the merger.[18] Approximately two months after the deal closed, the plaintiffs brought this suit, challenging the merger's fairness and "the failure of the board to disclose all material information to the Diamond stockholders regarding the tender offer."[19] The Court of Chancery dismissed the plaintiffs' claims for damages because the stockholders "overwhelmingly" accepted the tender offer upon disclosure of all material facts.[20] As to the issue before us, the Court of Chancery held that Cloobeck's views that the company had been managed suboptimally, the sale price was disappointing as a result, and therefore it was not a good time to sell

---

[15] Diamond Resorts' 2016 Proxy Statement (Apr. 15, 2016), App. to Appellant's Opening Br. 269.
[16] Verified Class Action Compl. (Oct. 21, 2016), App. to Appellant's Opening Br. 11.
[17] *Id.* at 60.
[18] *Appel v. Berkman*, 2017 WL 6016571, at *2 (Del. Ch. July 13, 2017).
[19] *Id.* at *1.
[20] *Id.* at *5.

the company were immaterial as a matter of law and their inclusion in Diamond Resorts' disclosures would not have materially altered the mix of information.[21]

## III.

The high-stakes context for evaluating whether the Court of Chancery's stark ruling is correct is important to bear in mind.  Here, the Diamond Resorts board was recommending to its stockholders that they cash out their investments.  But the Chairman of the Board, the very person who founded Diamond Resorts and under whose leadership as CEO the company flourished and became a global operation, did not agree with that recommendation.  The 14D-9 recites at length the events leading to the board's approval of the transaction and the reasons for the board's recommendation that stockholders accept Apollo's tender offer.[22]  But, somehow, that course of events does not include what we think to be a material fact that a reasonable investor in the company would wish to know: Cloobeck thought that it was the wrong time to sell.

"[D]irectors of a Delaware corporation have a fiduciary duty to disclose fully and fairly all material information within the board's control that would have a significant effect upon a stockholder vote when it seeks or recommends shareholder

---

[21] *Id.* at *2.
[22] Schedule 14D-9 Solicitation/Recommendation Statement (July 14, 2016), *supra* note 6, at 195−241.

action, such as when a tender offer or vote is presented."[23]  Information is material if there is a:

> substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.[24]

In contending that Cloobeck's reasons for not supporting the sale were immaterial, the defendants make much of the distinction between opinion and fact, arguing that because Cloobeck's belief that it was the wrong time to sell was just his opinion, his expression of that opinion to the board cannot be a material fact that requires disclosure.[25]  But, in this context, that distinction is of little relevance,

---

[23] 1 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 17.10[B], at 17-17 (3d ed. 1998).

[24] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal citations omitted).

[25] In so doing, the defendants appear to argue for a variation on the opinion-fact distinction akin to that used to determine whether a disclosure could give way to the reasonable reliance necessary to support a fraud claim. *See* Appellees' Answering Br. 17; *see, e.g.*, *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 775 (Del. Ch. 2014) ("Under Delaware law, to establish a claim of fraud or negligent misrepresentation, the plaintiff must demonstrate *justifiable reliance* on false representations made by the defendant.  In that regard, the misrepresentation forming the basis for the fraud or negligent misrepresentation claim must be material, and the plaintiff generally cannot rely, for example, on puffery, expressions of mere opinion, or representations that are obviously false.") (internal citations omitted); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 148 (Del. Ch. 2004) ("The law is rightly reluctant to find that mere expressions of opinion about the future can buttress a claim of fraud.  That a statement of opinion did not prove to be an accurate forecast of the future does not mean that the predicting party misstated any actual fact that could serve as the basis for reasonable reliance."); *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("Statements that are opinions or predictions [are only] actionable under the securities laws . . . [when] they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."); *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) ("[O]pinion or puffery will often not be actionable [as a securities fraud claim].").

because proxy statements seeking approval of major transactions are filled with statements of fact about opinions, in the sense that they recount why fiduciaries and their advisors took certain actions and why they believed the transaction was in the company's best interest. To this point, acres and acres of the 14D-9 focus on identifying the subjective reasons for the transaction, as well as other reasons against it.[26] For example, the 14D-9 lists the following opinions in its discussion of why the board recommended that stockholders tender their shares:

- [T]he strategic review committee's and the board of directors' belief . . . that the Company's strategic plan involved significant risks in light of the industry and competitive pressures the Company was facing and the strategic review committee's and the board of directors' concerns with respect to the risks relating to the Company's ability to execute on its strategic plan including the possibility that the strategic plan may not produce the intended results on the targeted timing or at all;[27]

- [T]he strategic review committee's and the board of directors' views and opinions on the industry in which the Company participates and market competition;[28]

- [T]he strategic review committee's and the board of directors' understanding of the business operations, financial conditions, earnings and prospects of the Company, including the prospects of the Company as a public company.[29]

---

[26] *See* Schedule 14D-9 Solicitation/Recommendation Statement (July 14, 2016), *supra* note 6, at 215−20.

[27] *Id.* at 216.

[28] *Id.* at 218

[29] *Id.*

8

In fact, when one reads all the many reasons the directors voted in favor of the transaction listed in the disclosures, so many that they can be lulling, it creates confidence that a disclosure that Cloobeck expressed to the board that he believed the company had been managed suboptimally and that this mismanagement negatively affected the sale price would catch a reasonable stockholder's attention and "significantly alter[] the total mix of information" in the 14D-9 about whether it was a favorable time to sell and why.[30] The 14D-9 could have included the fact that Cloobeck expressed certain hesitations about the merger in its discussion of the risk factors related to the merger, like "the potential upside in the Company's strategic plan and the possibility that the Company would meet or exceed the forecasts."[31] But it did not.

Placing heavy emphasis on a line of cases stemming from *Newman v. Warren*,[32] the defendants suggest that a director's reasons for dissenting or

---

[30] *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus.*, 426 U.S. at 449) (internal citations omitted).
[31] Schedule 14D-9 Solicitation/Recommendation Statement (July 14, 2016), *supra* note 6, at 218.
[32] 684 A.2d 1239 (Del. Ch. 1996). *Newman* is a Court of Chancery decision that was made in the hyper-expedited context of a motion for a temporary restraining order. In that case, the plaintiffs found fault with the failure of a proxy statement to discuss why a director opposed proceeding with negotiations about a merger, and why certain directors were absent when the merger agreement was approved. In considering these arguments, the Court of Chancery cautioned against the feasibility of requiring the disclosure of particular board members' reasons for their votes, given that boards act collectively. *Id.* at 1245. But consistent with its tradition, the Court of Chancery eschewed any *per se* rule of non-disclosure, referring instead to the existing law of fiduciary disclosure that "requires full and candid disclosure of all material facts." *Id.* at 1246 ("What is required is that the material facts relating to the company and the transaction be fully disclosed.") (emphasis omitted). Even further, a close reading of *Newman* reveals a critical factual difference between it and this case: the challenged proxy statement in *Newman* actually attributed specific concerns about the merger consideration and terms to the director who opposed continuing

9

abstaining from a decision of the board can never be material in the sense that they require disclosure.[33] But to the extent that the defendants read *Newman* as implying (as we do not) that the reasons given by a director for not supporting a board action can never be material and thus never must be disclosed, they advance a proposition at issue with the principles of Delaware corporate law addressing the duty of directors when advising stockholders on matters subject to a stockholder vote. It is inherent in the very idea of a fiduciary relationship that the stockholders that directors serve are entitled to give weight to their fiduciaries' opinions about important business matters.[34]

---

with the merger negotiations directly before stating that he opposed the board's decision to proceed. *Id.* at 1243.

[33] Appellees' Answering Br. at 3 ("The reasons for a director's vote are immaterial as a matter of law.").

[34] *E.g.*, Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 VAND. L. REV. 1087, 1101 (1996) ("[D]irectors ordinarily have far greater knowledge, or access to knowledge, than do non-managing stockholders. Thus, directors who recommend that stockholders vote a certain way, or sell (or not sell) their shares in response to a tender offer, place themselves in a position in which stockholders necessarily and properly rely upon that superior knowledge in determining how to act on a matter . . . .") (internal citations omitted); *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090–91 (1991) ("Shareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest. Naturally, then, the shareowner faced with a proxy request will think it important to know the directors' beliefs about the course they recommend and their specific reasons for urging the stockholders to embrace it."); *see also Smith v. Van Gorkom*, 488 A.2d 858, 888 (Del. 1985) (A board cannot just "take a neutral position and delegate to the stockholders the unadvised decision as to whether to accept or reject the merger."); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1058 (Del. 1996) (The "goal of disclosure" is to give directors the opportunity "to provide a balanced and truthful account" of the matters discussed in their disclosure materials.); *Glosser v. Cellcor Inc.*, 1994 WL 593929, at *22 (Del. Ch. Sept. 2, 1994) ("The whole purpose of the prospectus is to invite reasonable reliance.").

Accepting the notion that board disclosures should portray boards of directors as monolithic bastions of groupthink, within which no good faith back-and-forth occurs and no differences of opinion about important issues exists, would do little to breed respect for director decision-making. And it would adopt a vision of stockholders as immature and incapable of considering the pros and cons involved in important transactions. Full and fair disclosure involves giving stockholders a picture that is materially accurate, and in which the imperfections and inconsistencies are not airbrushed away.

The defendants point to a number of Court of Chancery decisions following *Newman* in which a director's stated reason for abstaining or dissenting was held to be immaterial.[35] Contrary to the stark *per se* approach the defendants advance, our decision in no way implies that the reason for a particular director's dissent or abstention will always be material. Rather, we adhere to the contextual approach that has long been Delaware law, which requires an examination of whether a fact— which can include the fact that a director shared with the board particular reasons for his position on an important transaction—would materially affect the mix of

---

[35] *E.g.*, *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958 (Del. Ch. Sept. 29, 2016); *In re Sauer-Danfoss Inc. Shareholders Litig.*, 64 A.3d 1116 (Del. Ch. 2011); *Dias v. Purches*, 2012 WL 4503174 (Del. Ch. Oct. 1, 2012); *In re Williams Companies, Inc. Stockholder Litig.*, No. CV 11236-VCN, 2016 WL 197177 (Del. Ch. Jan. 13, 2016).

information, or whether the disclosure is required to make sure that other disclosures do not present a materially misleading picture.[36]

That an advisor is respected, expert, and trusted does not mean that a beneficiary will not want to know the reasons behind their recommendation. For that very reason, board disclosures soliciting votes in favor of a transaction do not solely say that the board recommends the transaction, they instead provide detailed reasons why the board is making that recommendation. And when, as here, a board expresses its reasons for voting in favor of a transaction, the contrary view of an individual board member may be material to a stockholder wrestling with whether to accept the board's recommendation.

In fact, as the plaintiffs point out, a well-reasoned decision of Vice Chancellor, later Justice, Jacobs embraced that view 26 years ago. In *Gilmartin v. Adobe Resources Corporation*, the Court of Chancery found that the fact that two "key board members" thought it was a bad time to sell their natural gas company because of "the depressed oil and gas market" constituted information material to stockholders considering tendering their shares.[37] The Court of Chancery reasoned that:

---

[36] *See, e.g.*, 2 STEPHEN A. RADIN, THE BUSINESS JUDGMENT RULE, *supra* note 3, at 1740–41 ("[A]n omitted fact is material if . . . there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the total mix of information made available. The Delaware Supreme Court has reaffirmed this standard in a long line of cases . . . .") (gathering cases) (internal citations omitted).

[37] 1992 WL 71510, at *9 (Del. Ch. Apr. 6, 1992).

[t]he omitted fact was material, because if disclosed, it would have alerted the Preferred Stockholders to the possibility that a fair price might not be obtainable in this depressed market, and that, therefore, a merger might not be in their best interest. That the persons who entertained that view were Adobe's two most senior executives would have given heightened credibility.[38]

As in *Gilmartin*, the omission here was in the context of a high-stakes transaction: a sale for cash. Cloobeck—a "key board member" if ever there were one—objected to the timing of the transaction because mismanagement had negatively affected the sale price. And Cloobeck's objections, which would have alerted stockholders to the possibility that a fair price might not have been obtainable at the time of the transaction, were omitted from the 14D-9 recommending that stockholders tender their shares.

That a disclosure of Cloobeck's concerns could have been made succinctly is demonstrated by the minutes describing Cloobeck's position, which used terse words to convey the important information. Somehow these words did not find themselves in the 14D-9 submitted to stockholders. The defendants argue that stockholders could have guessed from what was disclosed—that the Chairman had not yet decided whether to tender his own shares and had abstained from voting on the company's sale—that the Chairman had reservations about the transaction.[39]

---

[38] *Id.* at *10 (internal citations omitted).

[39] Appellees' Answering Br. 22 ("The clear inference to be drawn from [the disclosures] is that Mr. Cloobeck had not yet decided whether the offered price was acceptable, which, of course, is the principal question to be decided by a stockholder, like Mr. Cloobeck, in a tender offer.").

But as we explain, stockholders should not be expected to speculate about facts any reasonable board advisor or director would find to be of importance. And as to this particular point, the decision ultimately made by Cloobeck as a stockholder to tender could have been motivated by understandable considerations unrelated to him changing his mind about his earlier statements. These include the substantial costs in terms of illiquidity, expense in litigation, and inability to redeploy the capital tied up during the proceedings that would have attended a decision to seek appraisal. For now, though, the important point is that although stockholders are assumed to be skilled readers, proxy statements are not intended to be mysteries to be solved by their audience.

Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression. Disclosures must "provide a balanced, truthful account of all matters they disclose."[40] "Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[41]

---

[40] 2 EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 212.04, at 7-80 (6th ed. 2014) (internal citations omitted).
[41] *Id.* at § 212.04, 7-78–7-79 (internal citations omitted).

14

Here, the board stated in its 14D-9 that upon "review of possible strategic and financial alternatives to a sale of the Company," it "determined [those alternatives] were less favorable to the Company's stockholders than the transaction."[42] But Cloobeck's view that it was a bad time to sell and that mismanagement had negatively affected the sale price for the transaction was directly at odds with this purported reason for shareholders to tender their shares. We find here that, as in *Gilmartin*, the 14D-9's representation to stockholders that they would "receive a fair price in the merger, [was] materially misleading without an additional simultaneous, tempering disclosure" that Cloobeck believed that this was "a bad time to sell" and had expressed the reasons for that view to the board.[43]

## IV.

For a Chairman to abstain from voting on the sale of the business he founded and led is no common thing, and when his reasons for doing so contradict the board's recommendations to the stockholders, it is difficult for us to understand how the omission was inadvertent. But regardless of the board's reason for omitting Cloobeck's concerns from the disclosures, the omitted facts are material and their omission precludes the invocation of the business judgment rule standard at the pleading stage. After discovery, it may well be that the plaintiffs' claims should be

---

[42] Schedule 14D-9 Solicitation/Recommendation Statement (July 14, 2016), *supra* note 6, at 215.
[43] *Gilmartin*, 1992 WL 71510, at *9.

15

disposed of upon a motion for summary judgment, but the sole basis for the Court of Chancery's dismissal was without merit, and we decline, given the nature of the omission, to accept the defendants' invitation for us to find another ground for affirmance, such as reliance on the exculpatory charter provision, which was not addressed by the Court of Chancery. For these reasons, we reverse and remand the plaintiffs' claims against all of the directors for proceedings consistent with this decision.[44]

---

[44] Relying on his abstention, Cloobeck argues that the dismissal against him should stand and notes that the plaintiffs never addressed this argument in responding to the defendants' motions to dismiss. Stephen J. Cloobeck's Answering Br. 2 (citing *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at \*1 (Del. Ch. Mar. 9, 1995)). But this argument, although fairly raised in the Court of Chancery, was never addressed by that court, and neither was Cloobeck's argument that plaintiffs' non-response waived this issue. *Appel*, 2017 WL 6016571, at \*4. On appeal, Cloobeck has presented us only with a one paragraph argument that appears to rely solely on his abstention from the merger vote and that fails to identify if he was involved in reviewing the 14D-9 as a member of the board, despite the reality that, in *Tri-Star Pictures*, only the duty of disclosure claims against the director-defendants who did not "review drafts of the proxy statement" were dismissed. *Tri-Star Pictures*, 1995 WL 106520, at \*2, n.3. On appeal, the plaintiffs have again failed to respond to Cloobeck's argument by ignoring it in their reply brief. But, given the cursory manner in which Cloobeck has pressed his unique argument before us, his primary reliance on the arguments made by the rest of the director-defendants, and the fact that the Court of Chancery has not yet addressed this argument in the first instance, allowing Cloobeck to renew his motion on remand commends itself as the most proportionate and balanced approach to an issue that neither the plaintiffs nor Cloobeck have approached with felicity.