**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| GLENN J. KREVLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 2022-0336-KSJM |
| ARES CORPORATE | ) | |
| OPPORTUNITIES FUND III, L.P., | ) | |
| ARES CORPORATE | ) | |
| OPPORTUNITIES FUND IV, L.P., | ) | |
| DAVID G. HIRZ, LELAND P. | ) | |
| SMITH, RICHARD N. PHEGLEY, | ) | |
| CITIGROUP GLOBAL MARKETS, | ) | |
| INC., and JEFFERIES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: October 15, 2024
Date Decided: February 3, 2025

Neil R. Lapinksi, Phillip A. Giordano, Christopher P. Clemson, Madeline Silverman, GORDAN, FOURNARIS, & MAMMERELLA, P.A., Wilmington, Delaware; *Counsel for Plaintiff Glenn J. Krevlin.*

T. Brad Davey, J. Matthew Belger, Matthew A. Golden, Charles R. Hallinan, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Defendants Ares Corporate Opportunities Fund III, L.P and Ares Corporate Opportunities Fund IV, L.P.*

Raymond J. DiCamillo, Matthew W. Murphy, Mari Boyle, RICHARDS, LAYTON, & FINGER, P.A., Wilmington, Delaware; Michele Johnson, LATHAM & WATKINS, Orange County, California; Zachery L. Rowen, LATHAM & WATKINS, New York, New York; *Counsel for Defendant David G. Hirz.*

David E. Ross, Roger S. Stronach, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Matthew Solum, Mike Rusie, KIRKLAND & ELLIS LLP, New York, New York; David A. Klein, KIRKLAND & ELLIS LLP, Los Angeles, California; *Counsel for Defendants Richard N. Phegley and Leland P. Smith.*

Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Bruce Birenboim, Susanna M. Buergel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Counsel for Defendant Citigroup Global Markets, Inc.*

Martin S. Lessner, Mary F. Dugan, Nehama L. Hanoch, YOUNG CONAWAY STARGETT & TAYLOR LLP, Wilmington, Delaware; Scott S. Balber, Michael P. Jones, HERBERT SMITH FREEHILLS, New York, New York; *Counsel for Jefferies, LLC.*

**McCORMICK, C.**

In April 2019, Smart & Final Stores, Inc. (the "Company") announced that its Board of Directors (the "Board") had approved a merger agreement under which affiliates of Apollo Management IX, L.P. ("Apollo") would acquire the Company's outstanding shares (the "Merger"). The plaintiff owned Company stock. He brought this lawsuit challenging the Merger. He alleges that the Merger was a conflicted-controller transaction because the Company's controller, a private equity firm, was in "harvest mode" and harbored undisclosed, liquidity-driven conflicts that tainted the sale process. He also contends that Company management, who stood to gain change-of-control payments, pushed the Company toward the Merger. According to the plaintiff, these facts and other material information were not disclosed to stockholders. The plaintiff sued the Board and the controller for breach of fiduciary duty. He also sued two of the Company's financial advisors for aiding and abetting. The defendants moved to dismiss the complaint under Rule 12(b)(6). They argue that the Merger was not a conflicted-controller transaction and that the uncoerced, fully informed vote of the stockholders warrants business judgment review under *Corwin v. KKR Financial Holdings LLC*.[1] They further argue that the plaintiff has not stated a claim under the business judgment standard. This decision grants the motions to dismiss.

---

[1] 125 A.3d 304 (Del. 2015).

## I.   FACTUAL BACKGROUND

These facts are drawn from the Second Amended Verified Stockholder Class Action Complaint (the "Second Amended Complaint") and the documents it incorporates by reference.[2]

### A.   The Company

The Company is a Delaware corporation headquartered in California. The Company has two lines of business: a traditional grocery store chain ("S&F") and a business-to-business food service provider ("SFW"). Apollo sold the Company to Ares in 2012, and the Company went public in 2014 through an IPO.

After the IPO, the Company pursued an aggressive expansion, opening 61 new S&F stores and 15 new SFW stores. The expansion had a negative short-term effect on the Company's profit and loss statements and balance sheets. In 2017, management began targeting e-commerce infrastructure as a business strategy. This also adversely affected the Company's profit and loss statements and burdened its balance sheet with several large one-time technology initiatives aimed at retooling key IT systems. The negative short-term effect on cash flow adversely affected the trading price of Company stock. Management, however, repeatedly and publicly expressed its confidence that these investments would ultimately benefit stockholders.

---

[2] C.A. 2022-0336-KSJM, Docket ("Dkt.") 42 ("Sec. Am. Compl.").

The plaintiff and his business partner routinely met with the Company's management team to discuss the Company's performance, projections, and strategy.[3] Around December 2017, the plaintiff had dinner with Company CEO David Hirz and Company CFO Richard N. Phegley. They discussed the infeasibility of separating the Company's two lines of business, the need to find a capital partner, and Hirz's belief that competition from Amazon, which had acquired Whole Foods, and Aldi would not affect the Company's business.[4]

**B.  Ares**

Ares Corporate Opportunities Fund III, L.P. ("Fund III") and Ares Corporate Opportunities Fund IV, L.P. ("Fund IV" and, together with Fund III, "Ares") collectively controlled about 57% of the Company's voting power. They also appointed two of the Board's nine members. Dennis Gies and David Kaplan served as Ares's Board members.

Ares launched Fund III in 2008 and Fund IV in 2012. By 2018, Ares had begun liquidating its holdings and significantly reducing its management fees in these two funds. In its 2018 10-K filing, Ares stated that Funds III and IV were in "harvest mode" and were "generally not seeking to deploy capital into new investment opportunities."[5] In its 2019 10-K filing, Ares noted that it had been realizing gains through monetizing investments held in Fund III and reiterated that Fund III was

---

[3] *Id.* ¶ 37.

[4] *Id.* ¶¶ 38–40.

[5] *Id.* ¶ 133.

3

in "harvest mode."[6]  In its 2020 10-K filing, Ares noted that it had stopped paying management fees on Fund III.

## C.     The Company Looks For A Strategic Partner.

On December 17, 2017, Apollo requested a meeting with Hirz to discuss investing one or more of its funds in the Company.  Apollo stated its belief that the market was undervaluing the Company.  On January 8, 2018, Apollo proposed a $400 million investment to repay debt and fund a $200 million tender offer at $9 a share. The Board rejected the proposal because it felt that the price was too low.

During a June 29, 2018 Board meeting, the Board formed a committee (the "Committee") to evaluate potential strategic alternatives.  The minutes state that the Board was concerned by the "meaningful challenges and headwinds" the Company faced, including "difficulties enhancing stockholder value."[7]  During the meeting, Ares's Gies told the Board that Ares "did not need to liquidate their positions in the Company and did not currently intend to participate in any strategic transaction involving the Company in any capacity other than on the pro rata basis together with stockholders of the Company."[8]

The Committee comprised Kenneth Tuchman, Paul Hopkins, and Joseph Tesoriero.  The plaintiff does not challenge the Committee members' disinterest or independence with respect to the Merger.  The Committee retained Proskauer Rose,

---

[6] *Id.* ¶ 136.

[7] *Id.* ¶ 7.

[8] *Id.* ¶ 54.

4

L.L.P. and Gibson, Dunn & Crutcher LLP as legal advisors. These firms also advised Ares and the Board. These relationships were disclosed to the Board.

In July 2018, Gies and Hirz met with the Committee and its legal advisors to select financial advisers. The Committee ultimately retained Jefferies, LLC and Citigroup Global Market, Inc. Both financial advisors had previously worked with the Company and had material relationships with Ares affiliates. Due to these relationships, the Committee engaged a third financial advisor, Centerview Partners, to render a fairness opinion. All of the financial advisers were renumerated on a contingent basis.

With help from the advisors, the Committee developed a plan for identifying, soliciting, and evaluating third-party interest, which included categorizing targets into two tiers that distinguished between financial and strategic partners. On October 28, 2018, Jefferies and Citigroup began contacting potential partners: three Tier 1 strategic partners, ten Tier 2 strategic partners, and 15 Tier 1 financial sponsors, including Apollo. By the time the Board voted to consummate the Merger, the Committee had contacted 74 parties. Of the contacted parties, 38 executed confidentiality agreements, eight attended in-person fireside chats, seven attended a management presentation and submitted preliminary proposals, and four submitted final proposals.

### D. The Five-Year Plan

During the strategic-partner search, the Committee instructed management to prepare financial projections for the five-year period from fiscal years 2019 to 2023

5

(the "Five-Year Plan"). Hirz, Phegley, and the Company's General Counsel Leland Smith prepared the Five-Year Plan. The Committee provided guidance during the drafting process. On September 12, 2018, the Committee, management, and Gibson Dunn attorneys met to discuss the underlying inputs and assumptions of the Five-Year Plan. The Committee provided comments, which management incorporated.

On September 17, Hirz, Phegley, and Smith presented a revised Five-Year Plan to Board members, Proskauer attorneys, and Ares representatives. The projections in the revised plan showed EBITDA growth from $188 to $273 million through 2023. At that meeting, the Board authorized the distribution of summaries to "interested parties in the process at the appropriate time."[9]

### E. The Merger Transaction

During a November 14, 2018 third quarter earnings call, management was positive about the Company's economic performance. Hirz said that management was "bullish" on the capital investments into their grocery stores and thought growth in that line of business could "outpace [the Company's] growth certainly this year and in 2019."[10] Phegley noted that the Company would slow its capital investments, freeing up cash to reduce the Company's financial leverage, and predicted that inflation would normalize. That December, management told investors that recent food deflation was a "historical anomaly."[11]

---

[9] *Id.* ¶ 66.

[10] *Id.* ¶ 72.

[11] *Id.* ¶ 75.

In January 2019, the Committee began exploring the possibility of expanding the process to invite parties to buy one of the Company's two divisions on a standalone basis. As of March 1, 2019, the Committee directed Jefferies and Citigroup to send final bid process letters to nine remaining parties of interest, including Apollo. The process letters instructed the interested parties to improve their proposed purchase prices and submit a final proposal by March 15, 2019. Two days before the deadline, the Company announced positive fourth quarter results.

On March 15, 2019, Apollo submitted a non-binding proposal to acquire all of the Company's outstanding equity at a purchase price of $6.50 per share in cash. The price was conditioned on, among other things, the Company executing a 15-day exclusivity agreement by the evening of March 17, 2019. Also on March 15, 2019, the Company received proposals from: (i) Party J to acquire only S&F for $400 million; (ii) Party B to acquire only SFW for $600 million; and (iii) Party D to acquire only SFW for $700 million.

The Committee met on March 16 and 17, 2019, to discuss the proposals. During the meetings, Committee members expressed concern that Party D's proposed acquisition of SFW "might entail complexities relating to regulatory filings and clearances required for such a transaction."[12] The Committee decided that it would not recommend entering into an exclusivity agreement with Apollo until the Board had a chance to review and discuss all the proposals.

---

[12] *Id.* ¶ 88.

The Board met on March 18, 2019, to receive an update on the strategic review process and further discuss the four proposals received by the Committee. Based on this discussion, the Board directed Jefferies and Citigroup to seek increased price indications from the parties that had submitted proposals. Later that day, Jefferies and Citigroup engaged in further negotiations with Apollo. Apollo increased its proposed purchase price from $6.50 to $6.75 per share, subject to the Company agreeing to exclusivity.

The Board met the next day. Based on the Committee's recommendation, the Board determined to enter into a 15-day exclusivity period with Apollo, through April 3, 2019.

Apollo engaged in confirmatory due diligence and, on March 25, lowered its offer to $6.30 per share. Apollo also conditioned the lowered offer on exclusivity, which the Committee declined to recommend in order to allow other interested parties to resume diligence.

The Committee evaluated various proposals over the ensuing weeks. The Committee was concerned about pursuing two complementary transactions that split the Company's businesses, as opposed to a single transaction that sold both business lines. For this reason, the Committee requested that Party J submit a joint proposal with Party D, which they submitted on April 11. They offered $6.50 per share.

In response to the combined April 11 offer, the Committee asked Parties D and J and Apollo to improve their respective bids. Apollo rejected this request and

8

stated that it would withdraw its offer unless the Company agreed to enter into another exclusivity agreement.

The Committee met again the next day, on April 12, 2019. Before the April 12 meeting, Parties D and J had reaffirmed their intent to submit a revised joint proposal with a purchase price of $7.00 per share. During the meeting, however, the Board's financial advisors stated that Parties D and J indicated their equity financing remained uncertain. Jefferies further advised that Parties D and J would likely require four weeks of diligence before executing a definitive agreement. Based on these considerations and "the meaningful risk in refusing [Apollo's] demand for short-term exclusivity," the Committee determined to recommend that the Board enter into a new, short-term exclusivity agreement with Apollo that would expire on April 15, 2019.[13] The Committee further recommended conditioning exclusivity on Apollo's agreement to try to finalize a deal with a price of $6.50 per share over the next several days.

The Board adopted the Committee's recommendation on April 15, deciding to provide Apollo with an additional twenty-four hours of exclusivity. Later that evening, Parties D and J formally submitted their $7.00 per share bid.

Also on April 15, at the Committee's direction, Hirz expressed to Apollo that the Company would have difficulty retaining employees if the outstanding employee equity awards were not accelerated and paid as part of the Merger. In response, Apollo agreed to allow outstanding employee equity awards to convert into payments,

---

[13] *Id.* ¶¶ 99–102.

accelerate the vesting and cashing-out of director and executive-owned options, convert restricted stock into the right to receive cash payments, accelerate cash awards to directors and officers, secure severance payments and benefits, and pay transaction bonuses to C-suite officers.

Of the Company's executives, Hirz and Phegley stood to gain the most from these terms, with shares worth $8,646,814 and $5,045,086 respectively.[14]

On April 16, 2019, the Board held a telephonic meeting to consider the proposals from Parties D and J ($7.00 per share) and Apollo ($6.50 per share). Centerview advised the Committee that the $6.50 purchase price was fair. The Committee determined that the proposed transaction was in the best interests of the Company and its stockholders.

Subsequently, the entire Board unanimously determined that it was in the best interest of the Company to enter into the Merger with Apollo and resolved to recommend that the stockholders accept Apollo's offer of $6.50 per share.

### F.    The Proxy Statement

The Company filed its Schedule 14D-9 on May 14, 2019 (the "Proxy Statement"), recommending the transaction.[15]

The Proxy Statement disclosed the financial advisors' conflicts.[16] It further disclosed the change-in-control payments that management would receive.[17]

---

[14] *Id.* ¶¶ 106–107, 165.

[15] Dkt. 44., Ex. A, May 14, 2019 Schedule 14D-9 (the "Proxy Statement") at 31.

[16] *Id.* at 26.

[17] *Id.* at 10.

10

The Proxy Statement also provided a thorough description of the sale process, including the higher value of the joint proposal from Parties D and J, and the Board's rationale for approving the Apollo offer. Among other things, the Proxy Statement disclosed:

- The Company had experienced increased operational costs associated with being a public company;

- The $6.50 price was more favorable to stockholders than any other alternative;

- The price represented a 25% premium over the average closing price, which the Board felt was unlikely to improve in the near future;

- Prolonging the deal would further distract senior management from implementing the Company's business plan; and

- The $7 per share joint proposal had material risks and uncertainties, would require significant legal and business diligence, and Party J still needed to secure additional equity financing to complete the proposed deal.[18]

On June 20, 2019, holders of 87% of the Company's outstanding stock tendered their shares, including 78% of the outstanding shares not held by Ares. The Merger closed that day. Nearly two years later, on May 17, 2021, Apollo sold the Company.

### G.    This Litigation

Plaintiff Glenn J. Krevlin ("Plaintiff") owned Company stock at the time of the Merger. He filed this action on April 14, 2022, nearly three years after the Company announced the transaction. He named Ares, Hirz, Smith, Phegley, Citigroup, and Jefferies as defendants (collectively, "Defendants"). He amended his complaint on July 15, 2022, and again on March 31, 2023.

---

[18] Sec. Am. Compl. ¶¶ 115–117.

The Second Amended Complaint contains four Counts. In Count I, Plaintiff claims that Ares breached its fiduciary duties as a controller. In Count II, Plaintiff claims that Hirz, Phegley, and Smith (the "Individual Defendants") breached their fiduciary duties as directors and officers. In Count III, Plaintiff claims that Citigroup and Jefferies (the "Financial Advisors") aided and abetted the other Defendants' breaches of fiduciary duties. In Count IV, Plaintiff claims that the Individual Defendants committed waste, but Plaintiff later dropped the waste claim.[19]

Defendants moved to dismiss the Second Amended Complaint on April 28, 2023.[20] The parties completed briefing on July 23, 2023,[21] and the court heard oral argument on October 15, 2024.[22]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss the Second Amended Complaint under Court of Chancery Rule 12(b)(6). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[23] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any

---

[19] Plaintiff abandoned the waste claim by failing to brief it. *See Emerald P'rs v. Berlin,* 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[20] Dkts. 44–48, 51.

[21] Dkts. 60–65.

[22] Dkt. 76.

[23] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC,* 27 A.3d 531, 536 (Del. 2011).

12

reasonably conceivable set of circumstances susceptible of proof."[24]  The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[25]

Defendants submitted five sets of briefs, each containing arguments unique to the claims against them.  They join in a common argument that resolves all issues.  Namely, Defendants argue that the Merger is not subject to the entire fairness standard and a majority of fully informed, uncoerced and disinterested stockholders tendered their shares.  Under *Corwin*, "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[26]  Defendants further contend that Plaintiff has not stated a claim under the business judgment rule.

Plaintiff argues that the Merger is subject to the entire fairness standard because Ares's need for liquidity caused it to favor a deal, even at a suboptimal price, over no deal at all.  Alternatively, Plaintiff contends that *Corwin* does not restore the business judgment standard because the stockholder vote was not fully informed.

---

[24] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[25] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[26] *Firefighters' Pension Sys. Of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 354 (Del. Ch. 2021) (quoting *Corwin*, 125 A.3d at 309); *see also In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 738 (Del. Ch. 2016) (noting that in mergers consummated under Section 251(h), stockholder approval "by accepting a tender offer has the same cleansing effect as a vote in favor of that merger").

## A.     Entire Fairness Does Not Apply.

"To determine whether directors have complied with the fiduciary standard of conduct, Delaware courts evaluate their actions through the lens of a standard of review."[27]  The most deferential standard is the business judgment rule.  The most onerous standard is the entire fairness test.  Enhanced scrutiny falls in between and supplies the presumptive standard in a third-party, cash-out merger.[28]

Plaintiff seeks to ratchet-up to entire fairness by arguing that the Merger was a conflicted-controller transaction.  There is no dispute that Ares controlled the Company.  But that alone will not trigger entire fairness review of a third-party deal.[29]  Rather, the controller must have divergent interests with respect to the transaction that gives rise to a legally cognizable conflict.  Plaintiff argues that Ares's need for liquidity rendered Ares conflicted with respect to the Merger.

"Delaware courts have been reluctant to find that a liquidity-based conflict rises to the level of a disabling conflict of interest when a large blockholder receives pro rata consideration."[30]  In those circumstances, this court views the controller's

---

[27] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.,* 2017 WL 1437308, at *25 (Del. Ch. Apr. 14, 2017).

[28] *See In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *32 (Del. Ch. Mar. 15, 2023), *aff'd in part and rev'd in part,* ---A.3d---, 2024 WL 4926910 (Del. 2024).

[29] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014) (noting "a large blockholder will not be considered a controlling stockholder unless they actually control the board's decisions about the challenged transaction").

[30] *Presidio*, 251 A.3d at 256; *see also Larkin v. Shah*, 2016 WL 4485447 (Del. Ch. Aug. 25, 2016) (rejecting a liquidity driven conflict theory); *In re Morton's Rest. Gp., Inc.,*

14

interests as "presumptively aligned with those of the unaffiliated holders of the Company's common stock."[31] That is because Delaware law ascribes to the belief that "when a fiduciary owns a material amount of common stock, that interest gives the fiduciary a 'motivation to seek the highest price' and a 'personal incentive . . . to think about the trade off between selling now and the risks of not doing so.'"[32] Liquidity-driven conflicts can be difficult to plead,[33] precisely because they ask the Court to infer that "rational economic actors have chosen to short-change themselves."[34]

Delaware courts are particularly chary to infer liquidity-based conflicts arising from the lifecycle of a private equity fund. The leading case on this issue is *Firefighters' Pension Systems of the City of Kansas City, Missouri Trust v. Presidio, Inc.* There, Vice Chancellor Laster surveyed the decisions of this court finding that complaints adequately alleged that a need for liquidity gave rise to a disabling conflict. None of the successful allegations rested on the lifecycle of a private equity fund. As the Vice Chancellor observed, "the desire to wrap up an existing fund . . .

---

*S'holders Litig.*, 74 A.3d 656 (Del. Ch. 2013) (same); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012) (same).

[31] *Presidio*, 251 A.3d at 255; *see also Synthes,* 50 A.3d at 1035 ("[W]hen a stockholder who is also a fiduciary receives the same consideration for her shares as the rest of the shareholders, their interests are aligned.").

[32] *Presidio*, 251 A.3d at 255 (*quoting In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 600 (Del. Ch. 2010)).

[33] *In re Mindbody, Inc.*, 2020 WL 5870084, at *33 (Del. Ch. Oct. 2, 2020).

[34] *Larkin,* 2016 WL 4485447, at *16 (*citing In re Morton's,* 74 A.3d at 666–67); *see also Presidio*, 251 A.3d at 260 (noting plaintiffs need to plead that the controller's "desire for liquidity was so strong that [the controller] would choose to leave money on the table").

15

can affect a fund manager's approach to achieving liquidity for an investment."[35] That cyclical process, however, "is not so formulaic and structured that the cycle itself would support an inference of a liquidity-based conflict."[36] Without more, therefore, the lifecycle of a fund "does not necessarily create a problematic interest."[37]

Here, Plaintiff rests his entire liquidity-driven conflict theory on the fact that Fund III and Fund IV were in "harvest mode." This, alone, is insufficient to render Ares conflicted.

In an effort to demonstrate something more than the mere lifecycle of a fund to support his conflict theory, Plaintiff makes a fleeting suggestion that the Funds' harvest-mode posture was at odds with circumstances that favored the Company continuing on as a standalone entity. These circumstances included: the Company's outperformance of management's projections; a likely normalization in food inflation; success on its long-term investment strategy; and buyers' willingness to offer to purchase segments of the Company at prices that were higher, in the aggregate, than the deal price.[38] But these factors point to valid business determinations by the Board, determinations to which Ares is not alleged to have contributed.[39] These allegations do not give rise to an inference that Ares faced unique external pressures

---

[35] *Presidio*, 251 A.3d at 258.

[36] *Id.* (citing *Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476, at *8–17 (Del. Ch. May 4. 2020) and *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *2 & n.2, *7 (Del. Ch. July 24, 2009)).

[37] *Presidio,* 251 A.3d at *258 (citing *Larkin*, 2016 WL 4485447, at *15–16).

[38] Dkt. 56 ("Pl.'s Answering Br.") at 43.

[39] *See, e.g.*, Sec. Am. Compl. ¶ 173.

16

that would put its interest in gaining liquidity at odds with the Company's best interests.

Because the Merger was not a conflicted-controller transaction, enhanced scrutiny presumptively applies.

**B.      The Business Judgment Standard Applies Under *Corwin*.**

Defendants seek to ratchet-down the standard of review to business judgment. Invoking *Corwin*, Defendants argue that the Merger was "approved by a fully informed, uncoerced majority of the disinterested stockholders."[40]  Plaintiff responds by challenging the sufficiency of the disclosures in the Proxy Statement.

A plaintiff challenging the sufficiency of disclosures for *Corwin* purposes bears the burden of pleading a disclosure deficiency.[41]   When assessing disclosure deficiencies at the pleading stage, the court must determine "whether Plaintiff's complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[42]  The inquiry is fact-intensive, and the court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality

---

[40] 125 A.3d at 306.

[41] *Morrison v. Berry*, 191 A.3d 268, 282 & n.60 (Del. 2018), *as revised* (July 27, 2018).

[42] *Id.*; *see also Malpiede v. Townson*, 780 A.2d 1074, 1086–87 (Del. 2001).

17

determination as a matter of law.[43]  One well-pled disclosure deficiency is sufficient to defeat a *Corwin* defense.[44]

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[45] Stated differently, "an omitted fact is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"[46]

"Just as disclosures cannot omit material information, disclosures cannot be materially misleading."[47]  "[O]nce defendants travel[] down the road of partial disclosure of the history leading up to the Merger . . . they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those

---

[43] *See, e.g.*, *McMullin v. Beran*, 765 A.2d 910, 926 (Del. 2000) (reversing order granting defendants' motion to dismiss where "answer[ing] the complaint, discovery and a trial may all be necessary to develop a complete factual record before deciding whether, as a matter of law, the . . . [d]irectors breached their [disclosure] duty"); *Branson v. Exide Elecs. Corp.*, 1994 WL 164084, at *3 (Del. Apr. 25, 1994) (TABLE) ("Whether or not a statement or omission in an offering prospectus was material is a question of fact that generally cannot be resolved on a motion to dismiss, but rather it must be determined after the development of an evidentiary record."); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *10 (Del. Ch. Jan. 18, 1996) (declining to rule that an omission was immaterial as a matter of law and noting that "[a] question of materiality is difficult to treat as a question of law on a motion to dismiss").

[44] *Kihm v. Mott,* 2021 WL 3883875, at *12 (Del. Ch. Aug. 32, 2021), *aff'd* 276 A.3d 462 (Del. 2022) (citing *In re Mindbody, Inc.*, 2020 WL 5870085, at *26).

[45] *Morrison*, 191 A.3d at 282 (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[46] *Id.* at 283 (quoting *Rosenblatt*, 493 A.2d at 944).

[47] *Id.*

historic events."[48]  A "[p]artial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[49]

Plaintiff argues that the Proxy Statement was materially deficient in three ways.

First, Plaintiff repackages his liquidity-driven conflict theory, arguing that the Proxy Statement was misleading because it failed to adequately disclose that Ares "steered this process" while its funds were "in a harvesting posture."[50]  This decision has already found that Plaintiff failed to adequately allege a misalignment of interests arising from the lifecycle of the Ares funds.  The allegations fare no better in the disclosure context.  The posture of Ares's funds was both innocuous and

---

[48] *Id.* (citing *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1280 (Del. 1994)); *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018) ("Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression."); *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002) ("When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts."); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 17.2[B][3][a], at 17-15 (4th ed. 2021) ("Although the board generally is not required to disclose all of the 'bends and turns in the road' in summarizing a proposed transaction, the Delaware Supreme Court has suggested that, once a board travels down the path of describing its process, it has a duty to provide a full and fair characterization of events."); 2 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 212.04[C], at 7-77 (7th ed. 2024) ("[I]f corporate fiduciaries volunteer information, even where there is no duty to disclose, they must do so truthfully and candidly.").

[49] *City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs., Inc.*, 319 A.3d 271, 304 (Del. 2024) (citing *Appel,* 180 A.3d at 1064).

[50] Pl.'s Answering Br. at 46.

immaterial.  This additional information would not have substantially altered the total mix of information available to stockholders.  Plaintiff's first disclosure theory does not work.

Second, Plaintiff takes issue with the Proxy Statement's "avowal that management did not negotiate its continued employment directly with Apollo."[51] Plaintiff contends that Hirz "used the Committee as management's liaison with Apollo to ensure management continuity—essential to the business plan's ongoing success—by bargaining for accelerated employee equity awards."[52]  Plaintiff did not plead this deficiency, which is a sufficient basis to reject it.

Also, it is unclear what more Plaintiff thinks should have been disclosed.  The Proxy Statement contains disclosures concerning accelerated management awards in connection with the Merger.[53]  The Proxy Statement discloses that the Committee asked Apollo to agree to accelerate awards for the purpose of employee retention.[54] The Proxy Statement further discloses that "Apollo Management IX agreed to permit the outstanding employee equity awards to be cancelled and converted into the right

---

[51] *Id*. at 47.

[52] *Id*.

[53] *See, e.g.*, Proxy Statement at 9 (disclosing that the "interests of executive officers and directors of S&F include . . . the accelerated vesting and cash-out of Company Options" and "the partial accelerated payment of Company Cash Awards"); *id.* at 11–12 (detailed disclosures, including names and dollar amounts, of accelerated awards).

[54] *Id*. at 38 (disclosing that, on April 15, 2019, "at the direction of the Committee, Mr. Hirz expressed his concern to representatives of Apollo Management IX regarding employee retention if outstanding employee equity awards were not accelerated and paid out to employees as part of the proposed transaction").

to receive payment on the terms set forth in Item 3 under the heading 'Treatment of Equity and Cash Awards in the Transactions.'"[55] Plaintiff does not contend that any of those disclosures were inaccurate or misleading.

What Plaintiff really wants, it seems, is for the court to infer that Hirz or management generally somehow controlled the Committee's discussions with Apollo on this point, but Plaintiff provides no basis for that inference.[56] Plaintiff's second disclosure theory fails.

Third, Plaintiff attacks a collection of disclosures concerning S&F's projections as a standalone entity and the business reasons for the Merger.[57] Plaintiff claims that the Proxy Statement was misleading when it "characterized food inflation and e-commerce as 'headwinds'" although management allegedly admitted "that inflation was anomalous and at an inflection point[.]"[58] In Plaintiff's view, "e-commerce would inure to [the Company's] benefit as a result of the business plan."[59] Plaintiff also takes issue with the Board's assessment that the following factors weigh in favor of

---

[55] *Id.* at 38.

[56] *See Teamsters Local 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *19 (Del. Ch. Jan. 31, 2023) (requiring "something more than speculation— communications, testimony—that employment discussions occurred between management and the acquiror during the sale process" to support a disclosure claim); *English v. Narang*, 2019 WL 1300855, at *12 (Del. Ch. Mar. 20, 2019), *aff'd*, 222 A.3d 581 (Del. 2019) (requiring that plaintiff "allege facts from which it reasonably can be inferred that such discussions occurred during the sale process" to support a disclosure deficiency based on process flaws).

[57] Pl.'s Answering Br. at 48–49.

[58] Sec. Am. Compl. ¶ 170.

[59] *Id.*

21

a Merger: "uncertainty around retailer valuations"; "the potential for increased competition from companies with greater scale and financial resources"; the Company's recent performance and business plan; the Merger consideration's certainty of value; and the cost of remaining a publicly traded company.[60] Plaintiff further disputes that the disclosure that "Amazon's entry [into the retail grocery business] was disruptive to e-commerce," and the Board's determination that prolonging the sale process was not in the Company's best interest.[61]

Nothing in this grab-bag of issues constitutes a disclosure deficiency. What Plaintiff presents as disclosure issues are no more than disagreements with the Board's decision. Substantive disagreements with a board's decision-making do not amount to disclosure violations.[62] Generally speaking, management's speculation of events to come concerning inflation and the state of the industry in the future are "not an appropriate subject for a proxy disclosure."[63] Plaintiff's third theory of disclosures, therefore, too misses the mark.

---

[60] *Id.* ¶ 173.

[61] *Id.*

[62] *See, e.g.*, *In re JCC Hldg. Co., Inc. S'holders Litig.*, 843 A.2d 713, 721 (Del. Ch. 2003) (dismissing disclosure claim where "[t]he plaintiffs' only beef" was alleged "mistakes in subjective judgment, even though those judgments were disclosed"); *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. 2009) ("There are limitless opportunities for disagreement on the appropriate valuation methodologies to employ, as well as the appropriate inputs to deploy within those methodologies. Considering this reality, quibbles with a financial advisor's work simply cannot be the basis of a disclosure claim.").

[63] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 145 (Del. 1997).

For these reasons, Plaintiff has failed to identify any disclosure deficiency sufficient to render the stockholder vote uninformed. Because this was the only attack on the *Corwin* defense, Defendants are entitled to review under the business judgment standard. Plaintiff fails to state a claim under that standard.

## III. CONCLUSION

Because Defendants' *Corwin* argument is successful, the court need not reach Defendants' other arguments for dismissal. Defendants' motions to dismiss are granted.

23